UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| IN RE:  ENFORCEMENT OF PHILIPPINE ) | |
| FORFEITURE JUDGMENT AGAINST ALL ) | |
| ASSETS OF ARELMA, S.A., FORMERLY ) | |
| HELD AT MERRILL LYNCH, PIERCE, ) | |
| FENNER & SMITH, INCORPORATED, ) | Misc. No. 19-412-LAK-GWG |
| INCLUDING, BUT NOT LIMITED TO, ) | |
| ACCOUNT NUMBER 165-07312, AND ) | |
| ALL INTEREST, INCOME OR BENEFITS ) | |
| ACCRUING OR TRACEABLE THERETO ) | |

_____

## **MEMORANDUM IN SUPPORT OF UNITED STATES' OMNIBUS MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.   General Background and Procedural History………………………………………..1

    A.  The Philippines Forfeiture Judgment Against the Arelma Assets…………………….1

    B.  This Section 2467 Action to Enforce the Philippine Judgment……………………….1

    C.  Duran's Answer and Affirmative Defenses…………………………………….....2

    D.  Roxas' Defenses……………………………………………………………….....2

II.  Summary Judgment Against Duran's Fifth Affirmative Defense…………………....3

    A.  The Republic Provided Duran and Merrill Lynch with Notice of the Sandiganbayan
       Action Through Its Filings in the Hawaii Interpleader Case…………………………3

    B.  Duran Also Had Notice of the Sandiganbayan Action Through Other Sources Within
       Months of the Filing of the Case in 1991 and Repeatedly Thereafter Into at Least
       2004…………………………………………………………………………………..6

    C.  The Standard for Due Process in a Section 2467 Action……………………………...7

    D.  The Republic Provided Notice Consistent with Due Process…………………………8

    E.  Duran Did Not Have an Interest in the Arelma Assets………………………………14

    F.  The Foregoing Arguments Apply Equally to Roxas…………………………………16

III. Summary Judgment Against Duran's Fourth Affirmative Defense……………………16

    A.  Additional Background to Duran's Fourth Affirmative Defense……………………16

    B.  Legal Standard for Fraud on the Court………………………………………………18

    C.  The Campos Settlement Was Fully Disclosed, and Any Non-Disclosure of the
       "Credit" Principle Cannot Constitute Fraud on the Court Because It Is a Mere Legal
       Principle That Was Publicly Known……………………………………………….19

    D.  Non-Disclosure of the "Credit" Principle Cannot Constitute Fraud on the Court
       Because Duran's Expert Admitted It Was a Questionable Principle………………...21

    E.  The Arelma Assets Would Be Forfeitable Despite the Supposed Credit……………21

IV.   Summary Judgment Against Duran's Eighth Affirmative Defense....................... 23

    A.   Duran's Two-Dismissal Argument Fails Because This Section 2467 Claim Is Categorically Different from the Claims in the 1986 Lawsuits-------------------------24

    B.   Duran's Two-Dismissal Argument Fails Because the Assets at Issue Here Are Different from Those in the Three 1986 Lawsuits.......................................26

    C.   Duran's Two-Dismissal Argument Fails Because the Application of the Two-Dismissal Rule Requires an Equitable Result...............................................26

V.   Summary Judgment Against Duran's Sixth Affirmative Defense..........................27

VI.   Summary Judgment Against Duran's Ninth Affirmative Defense..........................29

VII.   Summary Judgment Against Duran's Seventh Affirmative Defense.......................31

VIII.   Summary Judgment Against Duran's Second Affirmative Defense........................31

IX.   Summary Judgment Against Roxas' Pled Defenses........................................33

X.   Summary Judgment Enforcing the Philippine Forfeiture Judgment.........................34

The Government respectfully moves for summary judgment against all currently-pled defenses of the Duran and Roxas parties, and for summary judgment enforcing the Philippine forfeiture judgment and ending this case. The Government addresses the defenses in order of complexity, with the defenses that require the most factual or legal analysis addressed first.

## I.   General Background and Procedural History

### A.   The Philippines Forfeiture Judgment Against the Arelma Assets

The Republic of the Philippines elected Ferdinand Marcos president in 1965 and 1969. Dkt. 1 ("Application") ¶ 6. In September 1972, Marcos declared martial law. *Id.* His dictatorship ended in 1986 and he fled to Hawaii. *Id.*

Arelma S.A. was formed to hold an investment account for Marcos at Merrill Lynch in New York, into which $2 million was deposited in 1972. Application ¶ 7. The deposit— hereinafter "the Arelma Assets"—has increased in value and is now worth over $40 million. *Id.*

In 1991, the Republic initiated forfeiture proceedings in the Sandiganbayan—a Philippine anti-corruption court—to seek forfeiture of numerous Marcos assets, including the Arelma Assets. *Id.* at ¶ 10. The Republic moved for summary judgment against the Arelma Assets in 2004. *Id.* at ¶ 12. On April 2, 2009, the Sandiganbayan granted the Republic's motion and forfeited the Arelma Assets to the Republic. Dkt. 1-1, Attachment A, Ex. 1 ("Sandiganbayan Judgment"). After appeals were exhausted, the Sandiganbayan issued a Writ of Execution in 2014. Dkt. 1-1, Attachment A, Ex. 5.

### B.   This Section 2467 Action to Enforce the Philippine Judgment

In January 2015, the Republic formally asked the U.S. Government to enforce its forfeiture judgment against Arelma and all its assets. Application ¶ 13. Pursuant to 28 U.S.C. § 2467(b)(2), the Assistant Attorney General for the DOJ Criminal Division certified that the

Republic's request was in the interests of justice. *Id.* at ¶ 14.  The U.S. Government subsequently filed this Section 2467 enforcement action in June 2016.

### C.  Duran's Answer and Affirmative Defenses

The Duran Class is a class of individuals who suffered human rights abuses during the Marcos regime and who received a class action judgment against the Marcos estate from a U.S. court in the 1990's.  *See generally* Dkt. 38 at 1-2.  Duran is an intervenor in this action.  Dkt. 31 at 1.  On September 11, 2019, Duran filed his Answer.

Duran's Answer asserted nine affirmative defenses. Dkt. 35 at 5-11.  In 2020, this Court denied Duran's motion for summary judgment on his Third Affirmative Defense (statute of limitations) and granted the Government's cross-motion for summary judgment on this issue. Dkts. 100, 108.  On June 24, 2022, Duran withdrew his First Affirmative Defense (failure to state a claim).  The rest of Duran's affirmative defenses are addressed herein.

### D.     Roxas' Defenses

Roxas is the Estate of Roger Roxas, an amateur treasure hunter who allegedly discovered a Word War II-era Japanese treasure (the "Yamashita treasure") buried in the Philippines. Together with its affiliated corporation, Golden Budha [sic] Corporation, Roxas brought suit against Ferdinand and Imelda Marcos in Hawaii state court, alleging that they tortured Roxas and stole the treasure.  Roxas eventually won a money judgment for false imprisonment and battery, while Golden Budha Corporation won a money judgment for conversion of the treasure.  *See Estate of Roxas v. Marcos*, 121 Haw. 59, 73 (2009).

On October 24, 2019, Roxas and Golden Budha Corporation moved to intervene in this action and submitted an unsigned answer as an attachment to that motion. Dkts. 63, 63-2.  In January 2020, this Court held that Roxas satisfied the procedural statutory requirements for

entering this case.  Dkts. 96, 98 at 58-59.  However, the Court stressed that "a ruling on this point does not resolve any questions regarding what interest, if any, that Roxas has in the Arelma assets."  Dkt. 98 at 59:18-20.  On July 29, 2022, Roxas moved to amend its Answer to remove and add various affirmative defenses.  Dkt. 184.  Briefing has recently been completed on Roxas' motion, which remains pending and which the Government has partially opposed.  Dkts. 185, 186.

Contemporaneous with this motion, the Government is moving for summary judgment against Roxas for lack of standing.  If that motion is granted, then Roxas' motion to amend and Roxas' affirmative defenses will become moot.  In *this* motion, the Government moves for summary judgment against Roxas' Third Affirmative Defense (regarding notice) and Roxas' jurisdictional defense based on the location of the Arelma Assets, as set forth in Roxas' proposed amended answer (Dkt. 184-13).[1]  In an abundance of caution, the Government also addresses other defenses raised in Roxas' current Answer (prior to amendment), although Roxas has moved to withdraw such defenses.

## II.  Summary Judgment Against Duran's Fifth Affirmative Defense

Duran's Fifth Affirmative Defense alleges that "the Republic failed to give any notice, consistent with the principles of due process, of the Arelma forfeiture proceeding in the Sandiganbayan to the members of the Class or Merrill Lynch . . . .  The Republic's failure to give notice to the Class, its members and Merrill Lynch precludes recognition and enforcement of the Philippine forfeiture judgment pursuant to 28 U.S.C. § 2467(d)(1)(D)."  Dkt. 35 ¶¶ 45, 48.

### A.  The Republic Provided Duran and Merrill Lynch with Notice of the Sandiganbayan Action Through Its Filings in the Hawaii Interpleader Case

---

[1] If the Court rules that Roxas has standing and also grants Roxas' motion to amend its Answer to add other jurisdictional or fraud defenses, the Government may seek leave to file a further summary judgment motion against such new defenses.

Contrary to the allegations in Duran's Fifth Affirmative Defense, the Republic did provide notice of the Sandiganbayan action to both Duran and Merrill Lynch. Specifically, Duran and Merrill Lynch were both parties to the case of *Merrill Lynch v. Arelma Inc.*, No. CV00-595MLR (D. Haw.), an interpleader case that Merrill Lynch filed in the District of Hawaii to decide ownership of the Arelma Assets. The Republic made several filings in the interpleader case that disclosed both the existence of the Sandiganbayan action and the fact that the Republic sought forfeiture of the Arelma Assets in the Sandiganbayan action.

For example, on March 5, 2001, the Republic filed a motion to dismiss the interpleader case. In this 2001 motion, the Republic stated that "PCGG[2] has brought forfeiture proceedings before the Sandiganbayan, alleging that the assets secreted by Marcos in Switzerland, including Arelma and the Merrill Lynch account, were the fruits of illegal activities and therefore belonged to the Philippine government." Ex. A[3] [Mot. to Dismiss] at 9. The Republic further explained that "[t]he proceedings before the Sandiganbayan are continuing and are subject to an ultimate appeal to the Philippine Supreme Court. The final conclusion of those proceedings will determine who is rightfully entitled to the assets . . . . Arelma itself has agreed that the account standing in its name at Merrill Lynch must be transferred along with its shares to PNB[4] to be held pending the final outcome of the Sandiganbayan proceedings." *Id.* In asking the Hawaii federal court to defer to the Sandiganbayan proceedings, the Republic further stated that "[i]n seeking to recover Arelma and its assets for the Philippines, PCGG is acting under a statutory mandate to recover property misappropriated from the Republic of the Philippines . . . . That

---

[2] Philippine Commission on Good Government, the Republic agency that brought the Sandiganbayan action.

[3] All lettered Exhibits ("Ex.") are attached to the Declaration of Joshua L. Sohn, attached hereto.

[4] Philippine National Bank, which was appointed escrow agent for the bearer shares of stock in Arelma, Inc.

alone requires this court to defer to the Sandiganbayan proceedings." *Id.* at 14-15; *see also id.* at 18 ("at a minimum, international comity requires that this action be stayed pending the outcome of the Philippine proceedings. Such a stay would ensure that the Arelma funds remain secure pending resolution of the Republic's rights to Arelma and its assets in proceedings in the Philippines.").

The Republic's 2001 motion to dismiss attached an Affidavit of Danilo R.V. Daniel, a PCGG representative, which further explained how the Sandiganbayan action was seeking forfeiture of the Arelma Assets. *See, e.g.,* Ex. A [Daniel Affidavit] at ¶ 18 ("it is PNB's responsibility to ensure that the assets of Arelma are protected during the pendency of the judicial proceedings in the Philippines (before the Sandiganbayan Court) regarding ownership of Arelma and its assets.").

A year later, in a 2002 mandamus appeal from the interpleader case, the Republic filed a brief in the Ninth Circuit requesting that the district court be required to "stay the interpleader action pending completion of the Sandiganbayan action to determine the ownership of Arelma and its assets." Opening Brief of Republic of Philippines *et al.*, *Republic of Philippines v. U.S. District Court*, 2002 WL 32099869, *25 (9th Cir. April 1, 2002). Finally, after the Republic filed for summary judgment against the Arelma Assets in the Sandiganbayan in 2004, the Republic filed a request for judicial notice in the Ninth Circuit that attached the Sandiganbayan summary judgment motion. Ex. B. Thus, Duran and Merrill Lynch—who, again, were parties to the Ninth Circuit appeal—were provided with a copy of the summary judgment motion. Notably, the Sandiganbayan summary judgment motion was not *decided* until April 2009. Thus, the Republic provided Duran and Merrill Lynch with a copy of the summary judgment motion *more than four years before the motion was decided*.

**B. Duran Also Had Notice of the Sandiganbayan Action Through Other Sources Within Months of the Filing of the Case in 1991 and Repeatedly Thereafter Into at Least 2004**

The Duran Class also had notice of the Sandiganbayan action through other sources. For example, Duran's response to the Government's Interrogatory No. 1 states that "[t]he Class' Legal Representatives cannot recall exactly when they first learned of the Sandiganbayan forfeiture action but believe it was probably within 30 to 60 days after it was commenced [in 1991]." Ex. C at 2. Duran explained that the Duran Class' Legal Representatives received this notice of the Sandiganbayan action through contemporaneous newspaper articles and was able to obtain a copy of the Sandiganbayan forfeiture Petition through the Sandiganbayan clerk's office. *Id.* at 3-4. Moreover, at least one member of the Duran Class (Gloria Jopson) was a party to a 1998 Philippine Supreme Court case that extensively discussed the Sandiganbayan action. Ex. D at 9; Ex. E at 11. In addition, the aforementioned Danilo Daniel testified at deposition in this action that the Duran Class' Philippine counsel, Rod Domingo, met repeatedly with Philippine government officials during the pendency of the Sandiganbayan action to discuss the Sandiganbayan action. Ex. F at 103-04, 201-02. And, in 1997, a proposed settlement between the Duran Class and the Marcoses was put before the Sandiganbayan in the same Sandiganbayan action. *Id.* at 197-200.[5]

The Duran Class also had notice of the more specific fact that the Republic was seeking forfeiture of the Arelma Assets in the Sandiganbayan action. For example, the Republic publicly announced in August 2000 that it was seeking to forfeit the Arelma Assets in the Sandiganbayan. *See* "Manila Says Pursuing $30 Million in Marcos Assets," Reuters (Aug. 21, 2000) (Ex. G). The Class responded by asking that the Republic waive its claim to the Arelma Assets. *See*

---

[5] At this time, the Duran Class was known by its prior name of the "Pimentel Class."

6

"Philippines: President Denies Part in Blocking Payment to Human Rights Victims," BBC Int'l Reports (Dec. 1, 2000) (Ex. H) ("Also yesterday, human rights claimants reiterated their call to the PCGG that it waive its claim to the 35m dollars Marcos assets in the account of Panamanian firm Arelma Inc. in favour of the victims.").

Finally, after the Republic filed its summary judgment motion against the Arelma Assets in 2004, Duran admitted that he "probably" had notice of this document "within 30 or 60 days" after it was filed. Ex. C at 3. Duran obtained knowledge of the summary judgment motion through contemporaneous newspaper articles and was able to obtain a copy of the motion through the Sandiganbayan clerk's office. *Id.* at 3-4.

### C. The Standard for Due Process in a Section 2467 Action

The statutory subsection at issue here, 28 U.S.C. § 2467(d)(1)(D), states that a U.S. court may decline to enforce a foreign forfeiture judgment if "the foreign nation did not take steps, in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property of the proceedings in sufficient time to enable him or her to defend". "Due process" is a familiar term in U.S. law, and the phrase "due process" in Section 2467 is measured according to U.S. due process standards. For example, if the litigation procedures employed by the foreign nation are "analogous" to procedures that are permissible in U.S. litigation, then the foreign nation's procedures satisfy due process for purposes of Section 2467. *In re Restraint of All Assets Contained or Formerly Contained in Certain Inv. Accounts at UBS Fin. Servs., Inc.*, 860 F. Supp. 2d 32, 42 (D.D.C. 2012). Indeed, the legislative history to the statutory subsection at issue here—Section 2467(d)(1)(D)—shows that Congress meant to import U.S. standards of what sort of notice is required for due process. *See* H. Rep't. 107-250 Part 1, at 59-60 (Oct. 17, 2001) (citing three U.S. cases to explain what notice suffices for due process).

It makes sense that U.S. due process standards provide the yardstick in a Section 2467 action.  After all, Section 2467 evinces a Congressional policy that foreign forfeiture judgments should not be enforced if they violate certain aspects of due process.  But if enforceability hinged on whether the forfeiture judgment violated *foreign* standards of due process, then this would offer no protection against forfeiture judgments obtained in countries that had no conception of due process or whose conception of due process fell far below U.S. standards.

### D.  The Republic Provided Notice Consistent with Due Process

Here, the Republic indisputably provided Duran and Merrill Lynch with notice of the Sandiganbayan action, through the Republic's filings in the Hawaii interpleader case and associated Ninth Circuit appeal.  *See* Section (A), *supra*.  The Republic's U.S. court filings also provided notice of the more specific fact that the Sandiganbayan action sought forfeiture of the Arelma Assets.  *See id.*  The Republic even attached its Sandiganbayan summary judgment motion to its U.S. filings.  *See id.*  Because Duran and Merrill Lynch were parties to the U.S. case, they were provided with all these filings.

Notably, the notice that the Republic provided to Duran and Merrill Lynch vastly exceeds what is required in U.S. civil forfeiture cases.  Under U.S. civil forfeiture law, potential claimants must be given notice of the action itself at the outset of the proceedings (*see* Supp. Fed. R. Civ. P. G(4))—but once the Government has notified them that the action exists, the Government has no duty to serially notify potential claimants of every subsequent case event.  Ergo, due process does not require serial notice of every case event either—merely providing notice of the action itself is sufficient.  Here, the Republic indisputably notified Duran and Merrill Lynch about the existence of the Sandiganbayan action, which satisfies due process.  The Republic then went far above the due-process floor by even giving Duran and Merrill Lynch a

copy of its summary judgment motion against the Arelma Assets.

Duran's main counterargument is that the Republic did not mail notice to each individual member of the Duran Class, instead giving notice to Class counsel through the Republic's U.S. filings.  Yet under U.S. due process standards, giving notice to Class counsel was a perfectly acceptable way for the Republic to provide notice to the Duran Class.  *See* Fed. R. Civ. P. 5(b)(1) ("If a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party."); *Gonzalez v. City of New York*, 396 F. Supp. 2d 411, 418 (S.D.N.Y. 2005) ("notice conferred upon a class member's counsel may be imputed to the class member himself."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 370 n. 7 (S.D.N.Y. 1996) (same); *In re Deepwater Horizon*, 819 F.3d 190, 199 (5th Cir. 2016) (same); 32B AM. JUR. 2D FEDERAL COURTS § 1754 (2d ed.) (same); *see also Howard v. Loc. 74, Wood, Wire & Metal Lathers Int'l*, 208 F.2d 930, 934 (7th Cir. 1953) (holding, in class action context, that "notice of the judgment . . . was mailed to plaintiffs' counsel on July 21, which, under the provisions of Rule 5, is tantamount to service on plaintiffs."); *Stearns v. Ponderosa, Inc.*, No. C81-0542, 1982 WL 373, at *3 (W.D. Ky. July 30, 1982) (allowing defendant to seek modification of class action decree "upon thirty (30) days notice to counsel for the class").

For example, the well-known *Handschu* class action in this District generated a decree providing for a Civilian Representative to help monitor NYPD investigations of political activities.  In 2017, the *Handschu* court approved a settlement allowing the mayor to replace the Civilian Representative "on 14 days advance notice to Class counsel."  *Handschu v. Police Dep't of the City of New York*, 241 F. Supp. 3d 433, 439 (S.D.N.Y. 2017).  There was no suggestion that the mayor had to notify individual class members—rather, notice to class counsel was sufficient.  The same is true here.

Indeed, even if the Republic knew the names and addresses of each 9,500+ members of the Duran Class, it would have violated legal ethics rules for the Republic to contact the Class members directly, precisely because they were represented by Class counsel.  Under U.S. *and* Philippine ethics rules, a lawyer cannot directly contact a party who is represented by counsel but must instead direct all communications to counsel.  Am. Bar Ass'n Rule 4.2; Philippine Canon of Prof. Ethics No. 9 ("A lawyer should not in any way communicate upon the subject of the controversy with a party represented by counsel . . . but should deal only with his counsel.").[6]  Thus, consistent with ethics rules, the lawyers handling the Republic's case in the Sandiganbayan could not have contacted Duran Class members directly.  Instead, they needed to provide any notices to Class counsel, as they did.

The rule against direct contact with a represented party applies fully to class members represented by class counsel, once class certification has occurred.  As one leading class action treatise explained: "following certification, class counsel and absent class members have a formal, if unique, attorney-client relationship.  Absent class members are therefore 'represented parties,' and ethics rules prohibit opposing counsel from contacting them directly.  Defense counsel must therefore communicate with the opposing class members through class counsel after this point."  3 NEWBERG ON CLASS ACTIONS § 9:9 (6th ed.); *accord Van Gemert v. Boeing Co.*, 590 F.2d 433, 440 (2d Cir. 1978) ("A certification under Rule 23(c) makes the Class the attorney's client for all practical purposes"); *Fulco v. Cont'l Cablevision, Inc.*, 789 F. Supp. 45, 47 (D. Mass. 1992) ("'once the court enters an order certifying a class, an attorney-client relationship arises between all members of the class and class counsel.'  After the class has been certified, defendants' counsel must treat the unnamed class members as 'represented by' the

---

[6] *Available at* https://www.chanrobles.com/canonsofprofessionalethics.htm#.YsQ8p3bMI2w

class counsel for purposes of [the no-contact rule]"); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 99 (2000) ("A lawyer who represents a client opposing a class in a class action is subject to the anti-contact rule of this Section.  For the purposes of this Section, according to the majority of decisions, once the proceeding has been certified as a class action, the members of the class are considered clients of the lawyer for the class.").

Due process cannot require what legal ethics rules forbid.  Thus, due process did not require the Republic to give individual direct notice to Class members, given that the Republic's lawyers could not have directly contacted the Class members at all.[7]

In prior letter briefing, Duran sought to elide this point by citing caselaw about how certain notices during class actions must be sent to individual class members.  Specifically, Duran cited caselaw about how class certification rulings and settlement proposals must sometimes be sent to individual class members.  *See* Dkt. 180 (citing Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173-77 (1974); and *Rubin v. Assicurazinoi Generali*, 249 Fed. App'x. 237 (2d Cir. 2007)).  But these citations are inapposite for three reasons.  First, the Sandiganbayan action was not itself a class action.  Second, the notice at issue here was not notice of class certification or a proposed settlement—both of which are situations where class members might exercise their individual opt-out rights.  Rather, the notice at issue here was notice of a parallel legal action that allegedly implicated the Class' *collective* rights as

_____

[7] If Duran argues that the Republic should have tried to avoid the no-contact rule by using *non-lawyers* to send notice to Class members, such argument would be frivolous.  The Republic could hardly deputize non-lawyers to craft and send legal notice without lawyer involvement.  This would be "foolhardy" at best.  *See McKenzie L. Firm, P.A. v. Ruby Receptionists, Inc.*, No. 3:18-CV-1921, 2020 WL 2789873, at *6 (D. Or. May 29, 2020) ("given that it is clear that there can be no involvement by Defense Counsel, it would be foolhardy for Defendant to initiate any communication with class members about this lawsuit.").  Indeed, deputizing non-lawyers to craft and send legal notice would likely constitute legal malpractice and/or unauthorized practice of law.

judgment creditor of the Marcos estate.  Class counsel was already trying to enforce the Class'
judgment rights against the Arelma Assets, as shown by the Hawaii interpleader case that Merrill
Lynch filed after Class counsel demanded the Arelma Assets.  *See Republic of Philippines v.
Pimentel*, 553 U.S. 851, 858-59 (2008) (describing the genesis of the interpleader case).  Given
that Class counsel was already trying to enforce the Class' supposed rights to the Arelma Assets,
it was perfectly proper for the Republic to notify Class counsel that the Republic was opening a
new legal front against the Arelma Assets in the Sandiganbayan.  Duran has never argued that
the interests of Class counsel diverged from those of the Class members in this situation.  This is
in contrast to class certification or settlement proposals, where individual notice may be required
because the interests of class counsel and class members may diverge.  *See, e.g., Woodall v.
Drake Hotel, Inc.*, 913 F.2d 447, 451 (7th Cir. 1990) (individual notice of proposed settlements
protects the rights of class members where their interests may diverge from class counsel).

       Third, even in the context of class certification and settlement proposals, the general rule
is that *class counsel* must provide notice of such events to class members.  3 NEWBERG ON CLASS
ACTIONS § 8:32 (6th ed.) ("[T]he parties seeking class certification must initially bear the cost of
preparing and distributing the certification notice, including the expense of identifying the class
members."); *In re Adelphia Commc'ns Corp. Sec. & Derivatives Litig.*, 271 F. App'x 41, 44 (2d
Cir. 2008) ("It is clear that for due process to be satisfied, not every class member need receive
actual notice [of settlement proposal] as long as *class counsel* 'acted reasonably in selecting
means likely to inform persons affected.'") (emphasis added).[8]  Class counsel has access to class

---

[8] *Accord Snead v. Corecivic of Tenn., LLC*, No. 3:17-CV-00949, 2020 WL 6390146, at *7 (M.D.
Tenn. Apr. 6, 2020) ("the court will direct the plaintiffs to provide the best notice to class
members practicable under the circumstances"); *Vines v. Covelli Enter.*, No. 12-0028, 2012 WL
5992114, at *2 (W.D. Pa. Nov. 30, 2012) ("Prior to its final approval of the settlement
agreement, the district court must first approve the settlement preliminarily.  Preliminary

members and no ethical rule against contacting them, so it makes sense that class counsel must

send certain notices to individual class members.  By contrast, by the early 2000's, the Republic

was actively litigating against the Duran Class in the Hawaii interpleader case regarding

ownership of the Arelma Assets.  The Republic's lawyers could not have ethically sent any

notice to individual Class members, as detailed above.  Thus, it was perfectly proper for the

Republic's lawyers to instead provide notice to Class counsel through their U.S. court filings.

Indeed, there is a fundamental perversity to Duran's argument that the Republic's notice

to Class counsel was insufficient.  After all, Class counsel had an ethical duty to keep Class

members (its clients) apprised of important legal developments.  If Class counsel honored this

duty and relayed the Republic's notice to the Class members, then the Class members received

individual notice.  Conversely, if Class counsel did not relay the Republic's notice to the Class

members, then that is the fault of Class counsel, not the Republic.  Either way, the Republic

satisfied due process by providing notice to its litigation adversary—Duran Class counsel.

Duran has also argued that Philippine rules of court require notice to be sent in specified

ways, which allegedly were not followed here.  But this misses the point.  Section 2467 is a U.S.

statute, "due process" is a familiar term in U.S. law, and U.S. due process standards provide the

---

approval allows class counsel to notify class members who have not yet participated in the
litigation that their rights will be affected if the settlement subsequently receives final
approval."); *Moyle v. Liberty Mut. Ret. Benefit Plan*, No. 10-CV-2179, 2012 WL 13149097, at
*12 (S.D. Cal. Apr. 10, 2012) ("Although class certification is based on Rule 23(b)(1), class
counsel shall give notice to class members of the pendency of this action."); *Ciccarone v. B.J.
Marchese, Inc.*, No. 03-CV-1660, 2004 WL 2966932, at *1 (E.D. Pa. Dec. 22, 2004) ("The court
certified this case as a class action under Fed.R.Civ.P. 23(b)(3) and ordered class counsel to
notify class members of their rights under Fed.R.Civ.P. 23(c)."); *Goldenberg v. Marriott PLP
Corp.*, 33 F. Supp. 2d 434, 441 (D. Md. 1998) ("Some courts, in fact, have invalidated class
action settlements because of class counsel's failure to notify the class members of the potential
extent of their fee award."); *In re Prudential*, 164 F.R.D. at 368 ("This Court's August 29, 1995
Order required Class Counsel to send a copy of the Class Notice to each Class Member whose
address could reasonably be located").

benchmark in a Section 2467 action.  *See* Section (A), *supra*.  If Class counsel received notice, there is no due process defect, regardless of what Philippine rules might say about how notice should be provided.  *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) ("Espinosa's failure to serve United with a summons and complaint deprived United of a right granted by a procedural rule . . . But this deprivation did not amount to a violation of United's constitutional right to due process . . . United received *actual* notice of the filing and contents of Espinosa's plan.  This more than satisfied United's due process rights.") (emphasis in original).

Indeed, *Espinosa* shows how the Republic's provision of notice was actually superfluous for due process purposes.  *Espinosa*'s rule is that any failure to provide notice does not violate due process if the affected party had actual notice.  *Id.* at 272.  And as detailed in Section (B), *supra*, Duran's counsel had actual notice of the Sandiganbayan action, actual notice that the Republic sought to forfeit the Arelma Assets through the Sandiganbayan action, and actual notice of the Republic's summary judgment motion against the Arelma Assets.  Thus, due process did not require the Republic to notify Duran's counsel of these developments at all.  The Republic's provision of notice simply notified Duran's counsel of developments that Duran's counsel already knew about.  For this reason as well, there is no due process defect regarding notice.

### E.  Duran Did Not Have an Interest in the Arelma Assets

The foregoing sections of this motion assumed for the sake of argument that Duran had an "interest" in the Arelma Assets and thus was entitled to notice under Section 2467(d)(1)(D).  But the final reason why Duran's Fifth Affirmative Defense fails is that Duran did not have an interest in the Arelma Assets at the time the Sandiganbayan forfeited those assets in April 2009.  Because Duran did not have an interest in the Arelma Assets, Duran was not entitled to notice.

As this Court has already ruled: "case law is clear that a general unsecured creditor does not possess a legal right, title, or interest in the property that is forfeited . . . ." Dkt. 98 at 61:25-62:2; *accord In re 650 Fifth Ave. & Related Prop.*, No. 08-Civ.-10934, 2014 WL 1998233, at *4 (S.D.N.Y. May 15, 2014); *United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d 191, 199 (D.D.C. 2011) ("a general creditor can never have an interest in specific forfeited property"). When the Sandiganbayan forfeited the Arelma Assets in April 2009, the Duran Class was just a general unsecured judgment creditor of the Marcos Estate. The Class had not secured its judgment against the Arelma Assets by way of lien, levy, or other attachment. And while the Class had previously won a freezing injunction that allegedly included the Arelma Assets, the injunction ceased by 2005, long before the Sandiganbayan ruled. Ex. I at 87.

Duran's Answer asserts that the Class had an interest in the Arelma Assets because "[b]etween July 2004 and early 2009, the Arelma Assets were on deposit in the Class Settlement Fund held by the Clerk of the United States District Court for the District of Hawaii." Dkt. 35 at ¶ 44. The phrase "early 2009" is key. The Hawaii court formally released the Arelma Assets on February 19, 2009, more than a month before the Sandiganbayan forfeited the Arelma Assets in April 2009. *Merrill Lynch v. Arelma Inc.*, No. CV00-595MLR, Dkts. 442 and 443 (D. Haw. Feb. 18-19, 2004). Specifically, the Hawaii court released the Arelma Assets after the Supreme Court ruled in *Pimentel* that the Republic's sovereign immunity precluded the Hawaii case from proceeding. *Pimentel*, 553 U.S. 851. Thus, Duran cannot use the Hawaii court's custody of the Arelma Assets as the hook for Duran's interest, given that the Supreme Court deemed the Hawaii court's actions *ultra vires* and the Hawaii court relinquished custody before the Sandiganbayan ruled. In other words, the Sandiganbayan's forfeiture judgment cannot be infected by any alleged lack of notice to Duran, given that Duran had no interest in the Arelma Assets (and thus

15

no notice rights) when the Sandiganbayan ruled.

In fact, Duran did not have a valid interest in the Arelma Assets even in the July 2004-Feb. 2009 period, back when the Arelma Assets were held by the Hawaii court in the Class Settlement Fund. Again, the Supreme Court ruled in *Pimentel* that the Hawaii action was *ultra vires*. It follows that the Hawaii court did not have the right to hold the Arelma Assets at all. A party cannot claim a valid interest in an asset based on a court action that was *ultra vires*. Because Duran lacked a valid interest in the Arelma Assets even during the July 2004-Feb. 2009 period, Duran lacked notice rights under Section 2467(d)(1)(D).[9]

### F. The Foregoing Arguments Apply Equally to Roxas

As the Court is aware, Roxas has moved to amend its Complaint to allege a notice defense. Dkt. 184-13 at ¶ 29. Assuming Roxas is allowed to do so, the foregoing arguments defeat Roxas' proposed notice defense just as they defeat Duran's. Like Duran, Roxas was a party to the Hawaii federal interpleader case and associated appeals, and thus the Republic notified Roxas of the Sandiganbayan proceedings through its U.S. court filings. Furthermore, Roxas has never been anything more than an unsecured judgment creditor of the Marcos estate, and thus Roxas has no "interest" in the Arelma Assets as detailed above.

### III. Summary Judgment Against Duran's Fourth Affirmative Defense

### A. Additional Background to Duran's Fourth Affirmative Defense

Duran's Fourth Affirmative Defense alleges that "[t]he April 2, 2009 judgment of the Sandiganbayan was obtained by fraud within the meaning of Section 2467." Dkt. 35 ¶ 41. Section 2467(d)(1)(E) provides that a U.S. court may decline to enforce a foreign judgment if

---

[9] Moreover, at the time the Republic initiated its action against the Arelma Assets in 1991, the Duran Class was not yet even a general unsecured judgment creditor of the Marcoses, much less a judgment creditor with a secured interest in the Arelma Assets.

"the judgment was obtained by fraud."  28 U.S.C. § 2467(d)(1)(E).

To support his allegation that the Sandiganbayan judgment was obtained by fraud, Duran first states that Jose Y. Campos was one of Marcos' co-conspirators and was the individual who set up the Arelma account for Marcos.  Dkt. 35 ¶¶ 33-34.  In 1986, Campos settled with the Republic by paying the Republic $15 million and transferring to the Republic 28 corporations allegedly worth about $100 million.  *Id.* ¶ 36.  Duran next alleges that "[i]n 1989, the Philippine Supreme Court, sitting *en banc*, ruled that the amounts paid by Jose Y. Campos pursuant to the May 28, 1986 settlement must be credited to any claims against Jose Y. Campos' joint tortfeasors.  *Republic v. Sandiganbayan*, 173 SCRA 72 (1989)."  *Id.* ¶ 37.  Duran then alleges that, through the Campos settlement, the Republic recovered an amount of money equal to or greater than the Arelma Assets.  *Id.* ¶ 38.  He concludes that the Republic committed fraud by filing its forfeiture claim against the Arelma Assets "despite having received full payment from Jose Y. Campos" and "by omitting to inform the Sandiganbayan during the Arelma forfeiture proceeding that the Republic received full payment from Jose Y. Campos".  *Id.* ¶¶ 39-40.

Duran's interrogatory responses double down on his position that the "fraud" behind the Fourth Affirmative Defense is a supposed fraud on the Sandiganbayan.  Specifically, in response to an interrogatory seeking the basis for the Fourth Affirmative Defense, Duran stated that "the Republic *misrepresented to the Sandiganbayan* in its Motion for Partial Summary Judgment that the Arelma Assets were subject to forfeiture and seeking a declaration that the Arelma Assets should be forfeited to the Republic.  This was knowingly false since the Republic had settled litigation in Houston, Texas in May 1986 with Jose Y. Campos, alleged by the Republic to be a joint tortfeasor with Ferdinand Marcos, and the Republic recovered cash and properties far more than the value of the Arelma Assets . . . Second, between July 2004 and April 2009, the Republic

*committed fraud on the Sandiganbayan* by continuing to misrepresent that it was entitled to forfeit the Arelma Assets, and failing to disclose to the Sandiganbayan that the Republic fully recovered the value of the Arelma Assets in a settlement of litigation in Texas with Jose Campos in May 1986." Ex. E at 2-3 (emphasis added).

However, the Republic disclosed the Campos settlement to the Sandiganbayan, in a series of annexes attached to the 1991 Petition that commenced the Sandiganbayan case. These annexes to the very first filing in the Philippine forfeiture action enumerate the assets that Campos surrendered to the Philippines and state that this asset surrender was made to settle the U.S. case of *Republic of the Philippines v. Marcos et al.*, C.A. No. H-86-1184 (S.D. Tex.). Ex. J; *see particularly id*. at page 18 of 19. The Sandiganbayan acknowledged Campos' asset surrender in a footnote of its 2009 summary judgment opinion over the Arelma Assets. Sandiganbayan Judgment at 29 fn. 25.

### B. Legal Standard for Fraud on the Court

"The standard to prove 'fraud on the court' is extremely high . . . ." *Lee v. Marvel Enter., Inc.*, 765 F.Supp. 2d 440, 450 (S.D.N.Y. 2011). "[F]raud upon the court is limited to that species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*, No. 11-CV-1529 KMW KNF, 2014 WL 3747167, at *3 (S.D.N.Y. July 28, 2014) (brackets in original). "Examples of conduct that reach this high standard include 'bribery of a judge, jury tampering, or hiring an attorney for the sole purpose of improperly influencing the judge.'" *Denny v. Ford Motor Co.*, 959 F. Supp. 2d 262, 268 (N.D.N.Y. 2013). Conversely, even a single instance of perjury is not enough to meet this high standard. *Id*. Non-disclosure of

documents is also insufficient to meet this standard.  *Id.*

### C. The Campos Settlement Was Fully Disclosed, and Any Non-Disclosure of the "Credit" Principle Cannot Constitute Fraud on the Court Because It Is a Mere Legal Principle That Was Publicly Known

Under the foregoing legal standard, Duran's Fourth Affirmative Defense falls far short of showing a fraud on the court.  First, the Campos settlement was indisputably disclosed to the Sandiganbayan in a series of exhibits attached to the Petition that commenced the Sandiganbayan case.  As detailed above, these exhibits enumerate the assets that Campos surrendered to the Philippines and state that this asset surrender was made to settle the U.S. case of *Republic of the Philippines v. Marcos et al.*, C.A. No. H-86-1184 (S.D. Tex.).  The Sandiganbayan then acknowledged Campos' asset surrender in a footnote of its 2009 summary judgment over the Arelma Assets.  This should dispose of Duran's Fourth Affirmative Defense.

Nonetheless, at certain points in this case, Duran has suggested that the Republic committed fraud on the Sandiganbayan by not disclosing a supposed *legal consequence* of the Campos settlement—namely, that the Campos settlement supposedly entitled Marcos to a credit. *See, e.g.,* Ex. E at 3 (arguing that the Sandiganbayan failed to disclose the "impact of the Campos settlement").  But "[a]llegations that an opposing counsel mischaracterized the applicable law or the evidence submitted to the court 'does not rise to the level of fraud on the court.'"  *In re Old Carco LLC*, 423 B.R. 40, 53 (Bankr. S.D.N.Y. 2010) (quoting *Weldon v. United States*, 225 F.3d 647, 2000 WL 1134358, *2 (2d Cir. Aug. 9, 2000) (TABLE)); *see also King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95-96 (2d Cir. 2002) (alleged misrepresentations about the law do not constitute fraud on the court).

One could reach the same conclusion through a slightly different legal lens.  In a variety of fraud contexts, courts have held that there can be no case for fraudulent concealment if the

allegedly-concealed fact is a matter of public record or otherwise known to the public. *See, e.g.,
Vukadinovich v. Hanover Cmty. Sch. Corp.*, No. 13-CV-144, 2016 WL 6471467, at *1 (N.D. Ind.
Nov. 2, 2016) ("the School's failure to raise this publicly available fact at trial is not fraud on the
Court"); *Del Mar Land Partners, LLC v. Stanley Consultants, Inc.*, No. 11-CV-08013, 2014 WL
2452897, at *2 (D. Ariz. June 2, 2014) (rejecting claim of fraud on the court where undisclosed
information "was a matter of public record"); *see also 246 Sears Rd. Realty Corp. v. Exxon
Mobil Corp.*, No. 09-CV-889, 2012 WL 4174862, at *14 (E.D.N.Y. Sept. 18, 2012); *Szymborski
v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1200 (D. Nev. 2011); *In re Clearly Canadian Sec.
Litig.*, 875 F. Supp. 1410, 1418 (N.D. Cal. 1995). Here, the allegedly-concealed information—
*i.e.*, the legal "credit" principle—was publicly set forth in a 1989 Philippine Supreme Court
opinion, as Duran's Answer admits. Dkt. 35 ¶ 37 ("In 1989, the Philippine Supreme Court,
sitting *en banc*, ruled that the amounts paid by Jose Y. Campos pursuant to the May 28, 1986
settlement must be credited to any claims against Jose Y. Campos' joint tortfeasors.").

Not only did the 1989 opinion disclose the supposed "credit" principle, but it also
disclosed the fact of the Campos settlement itself. *See* Ex. K [1989 Opinion] at 14
("Undoubtedly, this resolution embodies a compromise agreement between the PCGG
[Philippine Commission on Good Government] on one hand and Jose Y. Campos on the other.
Hence, in exchange for the voluntary surrender of the ill-gotten properties acquired by the then
President Ferdinand E. Marcos and his family which were in Jose Campos' control, the latter and
his family were given full immunity in both civil and criminal prosecutions"). Even leaving
aside the Republic's disclosure of the Campos settlement in the forfeiture Petition annexes,
Duran cannot contend that the Campos settlement was fraudulently concealed when it was
publicly set forth in a Philippine Supreme Court opinion. *See supra* (public facts cannot be

fraudulently concealed).

**D.  Non-Disclosure of the "Credit" Principle Cannot Constitute Fraud on the Court Because Duran's Expert Admitted It Was a Questionable Principle**

Moreover, Duran's own Philippine law expert admitted that the "credit" principle was not a settled principle of Philippine law at all.  He testified that the credit principle derives from the penultimate paragraph of the aforementioned 1989 opinion. Ex. I at 76:2-78:8.  But he admitted that this paragraph did not actually make any credit ruling.  As Duran's expert explained in his deposition:

> A: That's why my opinion was limited to the fact that I said there is a legal basis for the application of that ruling, but it did not expressly allow for an offsetting.  In fact, there's no case in the Philippines which has recognized or reduced the – the amount of liability of the other co-conspirators – or of Marcos, I'm sorry . . . I'm not saying it's – I'm not saying it's the ruling of the Supreme Court or anything, but it – it provides a legal basis for arguing.
> . . .
>
> Q: Well, let me ask: so did the Philippine Supreme Court, in 1989, rule that those codefendants were entitled to a credit or not?
>
> A: In 1989?  No, there was no ruling on offsetting.

*Id.* at 99:1-101:15; *see also id.* at 103:12-19 (opining that the 1989 opinion merely "provided the legal basis for a *possible* offsetting") (emphasis added).  The Republic did not commit fraud on the court by failing to raise a speculative and unsettled argument, such as the "credit" argument here.  If a party commits fraud on the court by not preemptively raising every possible speculative legal argument, then fraud on the court would occur in literally every case.

**E.  The Arelma Assets Would Be Forfeitable Despite the Supposed Credit**

Any non-disclosure of the "credit" issue also cannot constitute fraud on the court because it could not impact the forfeitability of the Arelma Assets.  As Duran's Answer states, Campos surrendered $115M through the Campos settlement. Dkt. 35 ¶ 36.  But there was over $429M

remaining in the Sandiganbayan action when the Sandiganbayan forfeited the Arelma Assets, and the Arelma Assets were worth only $35M at that time. Thus, assuming *arguendo* that Marcos' liability should have been reduced by the $115M that Campos surrendered, that would still leave $314M ($429M minus $115M) that was forfeitable. The Arelma Assets were worth far less than $314M, so they would be forfeitable notwithstanding the supposed credit. Because the credit issue could not affect the forfeitability of the Arelma Assets, any nondisclosure of this issue cannot constitute fraud on the court.

There can be no genuine dispute about the numbers. The value of the Campos settlement ($115M) is taken from Duran's own Answer. The value of the Arelma Assets at the time of the Sandiganbayan Judgment ($35M) is taken from the Sandiganbayan Judgment itself. Sandiganbayan Judgment at 4. Finally, the amount of assets still subject to forfeiture at that time (at least $429M) can also be derived from the Sandiganbayan Judgment. Specifically, footnote 25 to the Sandiganbayan Judgment lists an assortment of assets in the Sandiganbayan action— some of which are given U.S. dollar (USD) valuations, some of which are given Philippine peso (PhP) valuations, and some of which are not given any valuations at all. Sandiganbayan Judgment at 29-30, fn. 25. At the 2009 exchange rate of roughly 1 PhP to .021 USD,[10] the PhP and USD assets total at least $429M.

In any event, this Court need not decide whether the remaining assets in the Sandiganbayan action totaled precisely $429M. Duran's expert admitted these assets were worth

---

[10] The Court may take judicial notice of this exchange rate, which can be found on any number of financial websites. *See Nature's Plus Nordic A/S v. Natural Organics, Inc.*, 78 F.Supp. 3d 556, 558 (E.D.N.Y. 2015) (taking judicial notice of exchange rate). As just one example, the St. Louis Federal Reserve provides historical exchange rates between U.S. and Philippine currencies:
https://alfred.stlouisfed.org/series?seid=FXRATEPHA618NUPN&utm_source=series_page&utm_medium=related_content&utm_term=related_resources&utm_campaign=alfred

"over \$300 million." Ex. I at 57:3-7, 62:20-63:4.  Using the most conservative \$300M figure, a credit equal to the \$115M Campos settlement would have reduced Marcos' liability to \$185M (\$300M minus \$115M).  The Arelma Assets were worth far less than \$185M, so they would be forfeitable despite the supposed credit.  *See also* Ex. I at 67:3-70:24 (Government confronting Duran's expert with this mathematical conclusion; Duran's expert admitting that "I don't see any flaw" in it and "I cannot give you a straight answer" about whether the Arelma Assets would be forfeitable despite the credit); *see also id.* at 74:17-24 (similar).

After the Government set forth this mathematical conclusion in its deposition of Duran's expert and its June 22 letter (Dkt. 181 at 4), Duran served a supplemental interrogatory response after the close of discovery seeking to dodge this conclusion.  Specifically, Duran argued that "[t]he credit to be applied relates solely to alleged misappropriations by Marcos in which Campos was a joint tortfeasor, not to alleged misappropriations in which Campos was not a joint tortfeasor."  Leaving aside this flagrant backfilling, Duran's new argument is unavailing.  After all, one class of forfeitable assets in the Sandiganbayan action *were the assets that Campos surrendered through the Campos settlement.  See* Sandiganbayan Judgment at 29 fn. 25, line item (3).[11]  Thus, if a Campos credit were applied to Marcos' liability in the Sandiganbayan action, it would have simply wiped out line item (3), leaving the rest of the assets in the case (including the Arelma Assets) forfeitable.

## IV. Summary Judgment Against Duran's Eighth Affirmative Defense

Duran's Eighth Affirmative Defense alleges that this Court cannot recognize the Sandiganbayan Judgment because the Republic previously brought and voluntarily dismissed

---

[11] There is nothing incongruous about the Republic trying to forfeit assets that Campos had already surrendered.  After all, Campos could surrender these assets on his own behalf, but forfeiture could extinguish ownership claims by everyone else in the world (including Marcos).

three U.S. lawsuits against the Marcos family.  Dkt. 35 ¶¶ 60-64.  Duran claims that, "[p]ursuant to FRCP 41(a)(1)(B), those voluntary dismissals 'operate as an adjudication on the merits' of the Republic's claims for misappropriation of the Republic's property, including its claims to the Arelma assets."  *Id.* ¶ 63.

Under Fed. R. Civ. P. 41(a)(1), a plaintiff can voluntarily dismiss an action without a court order by filing "(i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared."  Fed. R. Civ. P. 41(a)(1)(A).  "Unless the notice or stipulation states otherwise, the dismissal is without prejudice.  But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits."  Fed. R. Civ. P. 41(a)(1)(B).  This final sentence of Rule 41(a)(1)(B) is known as the "two-dismissal rule," as it holds that a plaintiff who voluntarily dismissed a claim twice usually cannot bring the claim again.  *Dist. Att'y of New York Cnty. V. Republic of the Philippines* ("*DANY*"), 307 F. Supp. 3d 171, 198-99 (S.D.N.Y. 2018).

### A.  Duran's Two-Dismissal Argument Fails Because This Section 2467 Claim Is Categorically Different from the Claims in the 1986 Lawsuits

The first reason why Duran's two-dismissal argument fails is that the claim in this Section 2467 enforcement action is categorically different from the claims in the three 1986 lawsuits.  This Court has already held that the "claim" in this Section 2467 action is the claim that the United States possesses "to <u>enforce</u> an existing foreign forfeiture judgment."  Dkt. 100 at 9 (emphasis in original).  The Court held that the United States' enforcement claim was distinct even from the claim that generated the underlying foreign forfeiture judgment.  *See id.*:

> [W]e reject [the] premise that the 'claim' being brought in a [S]ection 2467 action is in fact the same 'claim' that the foreign government had when it instituted the foreign forfeiture . . . .The foreign claim is a claim seeking to forfeit property.  The [S]ection

2467 claim is a separate action to enforce an existing foreign forfeiture judgment.

The three 1986 lawsuits that Duran relies on did not bring claims for enforcement of any foreign forfeiture judgment. Rather, they brought racketeering, unjust enrichment, conversion, and similar claims against the Marcoses. *See Philippines v. Marcos*, No. CV 86-3859, Third Amended Complaint at 2 (C.D. Cal. June 20, 1989); *Philippines v. Marcos*, No. H-86-1184, Complaint at 2 (S.D. Tex. Mar. 20, 1986); *Philippines v. Marcos*, No. 86 civ. 2294, Complaint at 17-18 (S.D.N.Y. Mar. 2, 1986).[12] Because the Section 2467 enforcement claim in this case is categorially different from the claims in the 1986 lawsuits, the voluntary dismissals of the 1986 lawsuits do not bar this case under the two-dismissal rule.

Nor could Duran avoid this conclusion by arguing that the enforcement claim in this Section 2467 action is "based on" the claims in the three 1986 lawsuits. First, the enforcement claim in this action is not based on *any* underlying U.S. claim—rather, it is based on the Philippine forfeiture judgment, which was in turn based on claims under Philippine law. Second, the language in the two-dismissal rule reads: "if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits." Fed. R. Civ. P. 41(a)(1)(B). Thus, for the two-dismissal rule to bar this Section 2467 claim, the 1986 lawsuits would have needed to be "based on or including" this Section 2467 enforcement claim. Only then could the voluntary dismissals of the 1986 lawsuits operate as an adjudication on the merits of this Section 2467 claim. But the 1986 lawsuits obviously were not "based on or including" this Section 2467 enforcement claim, since the Section 2467 claim did not exist until decades after the 1986 lawsuits were concluded.

In other words, the two-dismissal rule essentially says: "if you twice dismissed a case

---

[12] The three Complaints are attached as Exs. L-N. The S.D.N.Y. Complaint was originally filed in New York state court and is attached along with its removal papers.

based on or including claim X, you cannot bring claim X again." Here, claim X (the claim that Duran seeks to preclude) is the Section 2467 enforcement claim. Thus, for the two-dismissal rule to apply, Duran would need to show that the dismissed 1986 lawsuits were "based on or including" the Section 2647 enforcement claim. As noted above, this is a logical impossibility.

### B. Duran's Two-Dismissal Argument Fails Because the Assets at Issue Here Are Different from Those in the Three 1986 Lawsuits

The 1986 lawsuits also did not implicate the same claim as this case because the subject assets in those cases did not include the Arelma Assets. As *DANY* summarized, the 1986 "S.D.N.Y action [] involved five pieces of New York real estate; the claim in the S.D. Tex. Action [] involved Texas real estate; [and] the C.D. Cal. Action [] involved currency and personal property in certain banks in California and Hawaii." *DANY*, 307 F. Supp. 3d at 198. Of the Complaints in the three 1986 cases, only the C.D. Cal. Complaint even mentions the Arelma Assets. *See* Ex. M at 40.

As *DANY* held: "[t]hough each case involved claims of misappropriation of public property, the contested property was distinct. That is sufficient to distinguish the claims, for purposes of the two-dismissal rule." *DANY*, 307 F. Supp. 3d at 198. The same is true here. Because the property in this case is different from the property in at least two of the three 1986 lawsuits, the 1986 lawsuits do not bar this case under the two-dismissal rule.

### C. Duran's Two-Dismissal Argument Fails Because the Application of the Two-Dismissal Rule Requires an Equitable Result

Even if the Court found that this case falls within the literal scope of the two-dismissal rule (which it should not), the Court still should not apply the two-dismissal rule to bar this case. "Where the purpose behind the 'two[-]dismissal' exception would not appear to be served by its literal application, and where that application's effect would be to close the courthouse doors to

an otherwise proper litigant, a court should be most careful not to construe or apply the exception too broadly." *Poloron Prod., Inc. v. Lybrand Ross Bros. & Montgomery*, 534 F.2d 1012, 1017 (2d Cir. 1976). *DANY* applied this admonition to hold that "even if this Court were to find that the present claims are identical to those pursued in previously dismissed cases, it still would not apply the two-dismissal rule." *DANY*, 307 F. Supp. 3d at 198. It reasoned that:

> Application of the two-dismissal rule in the present action would not serve the statute's intended purpose. There is no evidence that the Republic has acted in bad faith or that it seeks to harass Mrs. Marcos or any of the claimants by filing, dismissing, and then refiling identical claims. The Republic did not, strictly speaking, bring this action. And the previously dismissed cases were brought more than two decades ago. Applying the two-dismissal rule here would prevent a purported victim of a sprawling crime—one where items purchased with misappropriated funds turn up decades apart and in numerous jurisdictions—from asserting a claim to the fruits of the crime. That, this Court believes, would be anathema to the purpose of the two-dismissal rule. For that reason, the Court will not apply the two-dismissal rule to the Republic's claims.

*Id.* at 198-99.

*DANY*'s logic applies with full force here (unsurprisingly, given that *DANY* addressed Marcos' kleptocracy and the same 1986 lawsuits that Duran relies on here). As in *DANY*, the Republic "did not, strictly speaking, bring this action," and there is no credible argument that this case involves any bad-faith, serial assertion of the same claims. The Republic simply obtained a forfeiture judgment against the Arelma Assets and asked the United States to enforce the judgment under Section 2467. Thus, as in *DANY*, the Court should not dismiss this case under the two-dismissal rule even if the rule's criteria were literally met (which they are not).

## V.  Summary Judgment Against Duran's Sixth Affirmative Defense

Duran's Sixth Affirmative Defense alleges that enforcement of the Philippine forfeiture judgment should be limited to $3,369,975.00, on the theory that this was the only sum of money adjudicated by the Sandiganbayan. Dkt. 35 ¶ 52. But this position is nonsensical. The Sandiganbayan ordered forfeiture of the *entire* investment account(s) held in the name of

27

Arelma, Inc. at Merrill Lynch.  $3,369,975.00 was merely the amount in the account(s) as of 1983, and the Sandiganbayan Judgment explicitly stated that its forfeiture judgment was *not* limited to this amount.  As stated in the final page of the Sandiganbayan Judgment:

> Partial Summary Judgment is hereby rendered declaring *all* the assets, investments, securities, properties, shares, interests, and funds of Arelma, Inc., presently under management and/or in an account at the Meryll [sic] Lynch Asset Management, New York, U.S.A., in the estimated aggregate amount of **US$3,369,975.00** as of 1983, *plus all interests and all other income that accrued thereon, until the time or specific day that all money or monies are released and/or transferred to the possession of the Republic of the Philippines*, are hereby forfeited in favor of petitioner Republic of the Philippines.

Sandiganbayan Judgment at 54 (bold in original, italics added), Dkt. 1-1 at 57.

In its April 25, 2012 decision, the Philippine Supreme Court specifically affirmed this holding, ruling that "[a]ll assets, properties, and funds belonging to Arelma, S.A. with an estimated aggregate amount of **USD 3,369,975** as of 1983, *plus all interests and all other income that accrued thereon, until the time or specific day that all money or monies are released and/or transferred to the possession of the Republic of the Philippines*, are hereby forfeited in favor of respondent Republic of the Philippines." Dkt. 1-1 at 94 (bold in original, italics added); *see also* Philippine Supreme Court Entry of Judgment, Dkt. 1-1 at 105 (quoting 2012 Philippine Supreme Court Judgment); August 22, 2014 Sandiganbayan Writ of Execution, Dkt. 1-1 at 109 (quoting 2012 Philippine Supreme Court Judgment).  Thus, by the express terms of the Sandiganbayan Judgment, the Philippine Supreme Court ruling affirming that judgment, the Philippine Supreme Court's Entry of Judgment, and the Sandiganbayan's subsequent Writ of Execution, the Philippine forfeiture judgment sought for enforcement here covers all assets of Arelma S.A., including all interest accruing thereto.

Relatedly, there is no merit to Duran's contention that interest and appreciation of the Arelma Assets is not "traceable to" to the initial tainted funds. Dkt. 35 ¶ 50.  Rather, when a

forfeitable property appreciates in value, the entire appreciated amount is "traceable to" the underlying violation and is thus forfeitable. *See, e.g., United States v. Afriyie*, 929 F.3d 63, 73 (2d Cir. 2019) ("We hold that as a matter of law, forfeiture may extend to the appreciation of funds acquired through illegal transactions"); *United States v. Tartaglione*, No. CR 15-491, 2018 WL 1740532, at *28 (E.D. Pa. Apr. 11, 2018) ("Where criminal proceeds are used to purchase or renovate a property, the Government is entitled to forfeiture of the proportion of the property traceable to criminal proceeds, including appreciation on that proportion."); *United States v. Vogel,* 08 Cr. 224, 2010 WL 547344, at *4 (E.D. Tex. Feb. 10, 2010) ("[T]he government may seize all property from illegal drug-trafficking activity including any investment returns, appreciation, and interests that are traceable to that property.").

## VI. Summary Judgment Against Duran's Ninth Affirmative Defense

Duran's Ninth Affirmative Defense alleges that "recognition of the Philippine forfeiture judgment is barred by the doctrine of comity." Dkt. 35 ¶ 65.  More specifically, Duran argues that the Philippine courts did not recognize the Class' U.S. judgment(s) against the Marcos Estate.  Thus, as a tit-for-tat measure, Duran argues that this Court should refuse to recognize the Philippine forfeiture judgment on comity grounds.  *See id.* ¶¶ 66-71.

"[T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts". *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C. Cir. 1984).  Duran asks this Court to apply a bizarre form of *reverse* comity, asking this Court to *refuse* to recognize the Philippine judgment because the Philippine courts did not recognize the Class' U.S. judgment(s).  Even if this sort of retaliatory reverse comity were theoretically acceptable,[13] it cannot be acceptable here.  This is

---

[13] The Government is not aware of any case where a court applied comity in this retaliatory

an action brought by the U.S. Government, after the Attorney General's designee determined that bringing this action was in the interests of justice. When the U.S. Government brings a lawsuit, comity cannot stand in the way, given that the Executive has already conducted the balancing of interests that the comity doctrine is designed to address. *See United States v. All Assets Held In Account No. XXXXXXXX*, 83 F. Supp. 3d 360, 371-72 (D.D.C. 2015) ("Here, the Executive Branch, through the Department of Justice, has brought this forfeiture action . . . '[b]ecause the Executive has already done the balancing in deciding to bring the case in the first place, the doctrine of international comity does not bar this lawsuit.'"); *United States v. All Assets Held at Bank Julius Baer & Co.,* 772 F.Supp.2d 205, 210 n. 3 (D.D.C. 2011) ("[A] case in which the United States is the plaintiff would seem a particularly unsuitable candidate for abstention on international comity grounds. Where, as here, the executive branch has decided that a forfeiture action is in the interests of the United States, declining jurisdiction out of deference to the interests of a foreign nation would be inappropriate."); 3 LITIGATION OF INT'L DISPUTES IN U.S. COURTS § 15:1 ("Efforts to assert comity as a defense to an action brought by the U.S. government, such as forfeiture, will normally fail as the executive itself has already performed the balancing of interests analysis.").

Duran's comity defense also fails because comity is not a valid defense to enforcement under the governing statute for this action, 28 U.S.C. § 2467. Section 2467 provides five defenses to enforcement of a foreign forfeiture judgment. 28 U.S.C. § 2467(d)(1)(A-E). Comity is not one of these five defenses and thus is not an available defense here. "Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise." *In re Maxwell*

---

reverse fashion.

*Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996). Here, Congress has indicated that there are only five defenses to a Section 2467 action, none of which include comity. A comity defense thus has "no application". *Id.*

VII.   **Summary Judgment Against Duran's Seventh Affirmative Defense**

Duran's Seventh Affirmative Defense alleges that the Class registered court judgments against the Marcos Estate and obtained levies over the Arelma Assets to satisfy these judgments. It asserts that, due to these judgment and levies, "[t]he Class has priority over any other claimant to the Arelma Assets." Dkt. 35 ¶ 58. However, this claim of priority fails as a matter of law. The Class' judgments trace back to a Hawaii money judgment from 1995, while the Class' levies date (at earliest) to a Sherriff's levy from 2009. Ex. O at 2. But the Sandiganbayan forfeited the Arelma Assets to the Republic—and under the relation-back doctrine, a forfeiture order vests title in the government as of the date of the acts giving rise to the forfeiture. *Pimentel* acknowledged this principle in the specific context of the Arelma Assets. *Pimentel*, 553 U.S. at 858 ("The Republic and the Commission claim a right to the assets under a 1955 Philippine law providing that property derived from the misuse of public office is forfeited to the Republic from the moment of misappropriation."). Thus, title to the Arelma Assets vested in the Republic as of the date Marcos misappropriated the money that created the Arelma Assets. This occurred no later than 1972, which is far earlier than any priority claim the Class possesses.

Moreover, as discussed above, Section 2467 provides only five defenses to enforcement of a foreign forfeiture judgment. 28 U.S.C. § 2467(d)(1)(A-E). None of these five defenses include a priority defense. Duran's priority defense fails for this reason as well.

VIII.   **Summary Judgment Against Duran's Second Affirmative Defense**

Duran's Second Affirmative Defense alleges that "[t]he Philippine courts lacked subject

31

matter jurisdiction over the Arelma Assets" because "[a]t the time the Arelma forfeiture action was pending in the Philippines, the Arelma Assets were in *custodia legis* of the federal court in Hawaii deposited in the Class Settlement Fund."  Dkt. 35 ¶¶ 27-28.  There are numerous fatal flaws with this defense.  First, as discussed above, the Hawaii court relinquished custody of the Arelma Assets before the Sandiganbayan ruled.  Second, *Pimentel* ruled that the Hawaii court's custody and jurisdiction over the Arelma Assets was invalid in the first place.  And third, even if the Hawaii court had validly exercised custody and jurisdiction over the Arelma Assets, Duran has introduced no evidence stating that a Philippine court lacks jurisdiction over assets held in a foreign court.  Indeed, the Philippine Supreme Court rejected this argument in denying reconsideration of its ruling affirming the Sandiganbayan judgment.  *See* Philippine Sup. Ct. order [Dkt. 1-1, Attachment A, Ex. 3 at 4] ("we find that the Sandiganbayan did not err in granting the Motion for Partial Summary Judgment, despite the fact that the Arelma account and proceeds are held abroad.").

In a recent interrogatory response, Duran sought to side-step his lack of evidence about Philippine jurisdictional law by reframing the issue as whether a <u>U.S.</u> court will <u>recognize</u> a foreign court's jurisdiction if the *res* was previously held by a U.S. court.  But again, this *res* was never validly held by a U.S. court at all—the Hawaii court's custody of the *res* was voided by *Pimentel* and ceased before the Sandiganbayan ruled.  The Hawaii court's invalid and voided custody of the Arelma Assets provides no basis for this Court to deny the Sandiganbayan's jurisdiction.

In any event, in analogous U.S. forfeiture cases brought against assets located outside the United States, U.S. law expressly allows dual U.S.-foreign jurisdiction over the *res*.  Indeed, the jurisdictional statute for U.S. civil forfeiture cases states: "Whenever property subject to

forfeiture under the laws of the United States is located in a foreign country, *or has been detained or seized pursuant to legal process or competent authority of a foreign government*, an action or proceeding for forfeiture may be brought [in various U.S. district courts]." 28 U.S.C. § 1355(b)(2) (emphasis added). Because dual forfeiture jurisdiction is expressly allowed under U.S. law, there is no basis for this Court to deny the Sandiganbayan's assertion of jurisdiction over assets located in the United States.[14]

### IX. Summary Judgment Against Roxas' Pled Defenses

The Government also seeks summary judgment against Roxas' currently-pled affirmative defenses (although Roxas has moved to withdraw such defenses). Roxas' first defense is that the Government's enforcement Application "fails to state a cause of action upon which relief may be granted." Dkt. 63-2 ¶ 26. However, the Application was fully sufficient to state a cause of action. The Application explained that there was a final Philippine forfeiture judgment that was no longer subject to appeal. Dkt. 1 ¶¶ 1, 5, 12. It explained that the Republic of the Philippines made a request for the United States to enforce its forfeiture judgment under Section 2467. *Id.* ¶ 13. It explained that the U.S. Attorney General's designee had certified that the Republic's request was in the interest of justice. *Id.* ¶ 14. And it attached the relevant supporting documents. Dkt. 1-1. This states a claim under Section 2467.

Roxas' second defense is that this action is barred by the statute of limitations. Dkt. 63-2 ¶ 27. But this Court already held otherwise. Dkts. 100, 108. Roxas' final three defenses are that the Application is barred by "the doctrine of unjust enrichment" (*id.* ¶ 28), "is barred by documentary evidence" (*id.* ¶ 33), and that "the United Sates is not entitled to benefit from the

---

[14] Roxas has also moved to amend its Answer to raise a jurisdictional defense based on the Arelma Assets being held in the United States. Dkt. 184-13 at ¶ 27. This appears to be a copy of Duran's Second Affirmative Defense. Thus, the foregoing discussion applies equally to Roxas' proposed defense.

Philippine forfeiture judgment and related orders." *Id.* ¶ 32.  These vague defenses fail as a matter of law.  Again, Section 2467 lists five defenses.  28 U.S.C. § 2467(d)(1)(A-E).  Roxas' "unjust enrichment", "documentary evidence", and "not entitled to benefit" defenses are not statutory defenses under Section 2467 and thus should be disposed of at summary judgment.[15]

## X.  Summary Judgment Enforcing the Philippine Forfeiture Judgment

Finally, the Government seeks summary judgment enforcing the Philippine forfeiture judgment and ending this case.  Section 2467(d)(1) states that, upon application by the U.S. Government, the district court "shall" enforce a foreign forfeiture judgment unless one of the five statutory defenses is present.  As detailed above, Duran and Roxas have not raised any valid defenses to enforcement.  Their defenses all fail at summary judgment.  Thus, the Government is entitled to summary judgment enforcing the Philippine forfeiture judgment and ending this case. A proposed order is attached.

<div style="margin-left:40%">

Respectfully submitted,

JAMES CURT BOHLING, ACTING CHIEF
MONEY LAUNDERING AND ASSET
RECOVERY SECTION

*/s/ Joshua L. Sohn*
DANIEL H. CLAMAN
Principal Deputy Chief, International Unit
JOSHUA L. SOHN
Trial Attorney, International Unit
Money Laundering and Asset Recovery Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530

</div>

---

[15] Unjust enrichment is also a *claim*, not a defense at all.  *Lombardi v. City of Cornersville*, No. 1:06-0072, 2007 WL 190324, *2 (M.D. Tenn. Jan. 22, 2007) ("Unjust enrichment is a separate cause of action, not a defense.").

Telephone:  (202) 514-1263

Attorneys for the United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2022, I caused the foregoing document to be served, via CM/ECF, to all counsel of record in this action.

By:         */s/ Joshua L. Sohn*
                   Joshua L. Sohn