UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

IN RE ENFORCEMENT OF PHILIPPINE          :
FORFEITURE JUDGMENT AGAINST
ALL ASSETS OF ARELMA, S.A.,              :      19 Misc. 412 (LAK) (GWG)
FORMERLY HELD AT MERRILL
LYNCH, PIERCE, FENNER & SMITH,           :      REPORT & RECOMMENDATION
INC., INCLUDING BUT NOT LIMITED
TO ACCOUNT NO. 16                        :

---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

The United States of America brought this application to register a foreign forfeiture

judgment pursuant to 28 U.S.C. § 2467.  See Application, filed June 27, 2016 (Docket # 1).

Respondents Jose Duran and the Estate of Roger Roxas ("Roxas") oppose the application.  The

Government now moves to dismiss Roxas as a respondent on the ground that Roxas lacks

standing to challenge the application.[1]  The Government also seeks summary judgment on the

defenses pled by both Roxas and Duran.[2]  Duran has cross-moved for summary judgment on his

---

[1]  Notice of Motion, filed Sept. 8, 2022 (Docket # 188); Memorandum in Support, filed Sept. 9, 2022 (Docket # 199) ("Gov't Standing Mem."); Rule 56.1 Statement, filed Sept. 9, 2022 (Docket # 200) ("Gov't Standing R. 56.1 Statement"); Memorandum in Opposition, filed Oct. 27, 2022 (Docket # 215) ("Roxas Standing Opp."); Response, filed Oct. 27, 2022 (Docket # 216) ("Roxas Standing R. 56.1 Response"); Declaration of Clay Robbins III, filed Oct. 27, 2022 (Docket # 218) ("Second Robbins Decl."); Reply, filed Feb. 9, 2023 (Docket # 252) ("Gov't Standing Reply").

[2]  Notice of Motion, filed Sept. 8, 2022 (Docket # 193); Memorandum in Support, filed Sept. 9, 2022 (Docket # 203) ("Gov't SJ Mem."); Rule 56.1 Statement, filed Sept. 9, 2022 (Docket # 204) ("Gov't SJ R. 56.1 Statement"); Declaration of Joshua L. Sohn, filed Sept. 9, 2022 (Docket # 205) ("Sohn Decl."); Declaration of Joshua L. Sohn, filed Sept. 9, 2022 (Docket # 206) ("Second Sohn Decl."); Memorandum in Opposition, filed Oct. 27, 2022 (Docket # 208) ("Roxas SJ Opp."); Response, filed Oct. 27, 2022 (Docket # 209) ("Roxas SJ R. 56.1 Response"); Declaration of Clay Robbins III, filed Oct. 27, 2022 (Docket # 211) ("Robbins Decl."); Memorandum in Opposition, filed Oct. 28, 2022 (Docket # 228) ("Duran Opp."); Response, filed Oct. 28, 2022 (Docket # 230) ("Duran R. 56.1 Response"); Reply and Opposition, filed Nov. 14, 2022 (Docket # 236) ("Gov't SJ Reply").

defenses requesting dismissal of the application.[3]  For the reasons that follow, the Government's motion on standing should be granted, the Government's summary judgment motion should be granted, and Duran's cross-motion should be denied.

I.    BACKGROUND

The facts that gave rise to the instant action have been set out in prior related litigation, see, e.g., Republic of Philippines v. Pimentel, 553 U.S. 851 (2008); Dist. Att'y of New York Cnty. v. Republic of Philippines, 307 F. Supp. 3d 171, 180-88 (S.D.N.Y. 2018) ("District Attorney"); Swezey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 N.Y.3d 543 (2012), and in a decision issued earlier in this case, see In re Arelma, S.A., 2019 WL 3084706 (D.D.C. July 15, 2019).  We describe below only the factual and procedural history necessary to provide background for the instant motions.

A.    The Arelma Account

Ferdinand Marcos was the President of the Republic of the Philippines (the "Republic" or the "Philippines") from 1965 to 1986.  Swezey, 19 N.Y.3d at 546-47.  Marcos committed human rights violations and also transferred public assets to his personal control — amassing a fortune worth billions of dollars.  Id. at 547.  In 1972, a man named Jose Campos facilitated the creation of a Panamanian corporation named Arelma, S.A. ("Arelma") on behalf of Marcos.  Duran R. 56.1 Statement ¶ 3.  Campos then created an investment account for Arelma (the "Arelma Account") at Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"), which was funded by a

---

[3]  Notice of Cross-Motion, filed Oct. 28, 2022 (Docket # 222) ("Cross-Mot."); Memorandum in Support, filed Nov. 4, 2022 (Docket # 232) ("Duran Cross-Mot. Mem."); Rule 56.1 Statement, filed Nov. 11, 2022 (Docket # 233) ("Duran R. 56.1 Statement"); Declaration of Robert A. Swift, filed Nov. 4, 2022 (Docket # 234) ("Swift Decl."); Response, filed Nov. 14, 2022 (Docket # 237) ("Gov't R. 56.1 Response"); Gov't SJ Reply; Reply, filed Feb. 9, 2023 (Docket # 250) ("Duran Cross-Mot. Reply").

$2 million transfer from a Swiss bank account.  Id. ¶¶ 4-5.  That deposit was the sole source of the funds in the Arelma Account (the "Arelma Assets").  Id. ¶ 6.

In 1986, Marcos was forced out of office and fled the Philippines to Hawaii.  See Swezey, 19 N.Y.3d at 547.  The Philippine Presidential Commission on Good Government (the "PCGG") was then created to recover property he wrongfully acquired.  Pimentel, 553 U.S. at 858; see also Swezey, 19 N.Y.3d at 547.  In 1991, the PCGG asked the Sandiganbayan, a court in the Philippines with special jurisdiction over corruption cases, to "declare forfeited to the Republic any property Marcos has obtained through misuse of his office."  Id.  As described further below, the PCGG eventually sought to forfeit the Arelma Account specifically.

B.    Roxas

In January 1971, Roger Roxas discovered in the Philippines a stockpile of gold and gems, along with a statue of a golden Buddha, which he believed to be treasure left behind after the Japanese occupation during the Second World War (the "Yamashita Treasure" or "Treasure").  See Roxas v. Marcos, 89 Haw. 91, 101 (1998).  From the initial excavation, Roxas recovered "twenty-four bars of gold, . . . some samurai swords, bayonets, and other artifacts," and Roxas later discovered "more than two [handfuls]" of diamonds inside the Buddha statue.  Id. at 101-02.  The "vast majority" of the Yamashita Treasure had not been recovered from the stockpile by 1972.  Gov't Standing R. 56.1 Statement ¶ 2; Roxas Standing R. 56.1 Response ¶ 2.  In April 1971, government agents, supposedly under orders from Marcos, "took the [B]uddha, the diamonds, . . . seventeen bars of gold, the samurai swords, a piggy bank belonging to Roxas's children, and his wife's coin collection."  Roxas v. Marcos, 89 Haw. at 102.  Roxas and a group of investors, the Golden Budha Corporation [sic] ("Golden Budha"), brought suit in Hawaii state court against Marcos and Imelda Marcos, Ferdinand Marcos's wife, for conversion of the

Treasure.  Id. at 109.  Roxas succeeded in proving his conversion claim and was awarded $13,275,848.37 in damages.  See Est. of Roxas v. Marcos, 2001 WL 36284628 (Haw. Cir. Ct. Sept. 6, 2001), aff'd, 109 Haw. 83 (Nov. 29, 2005).[4]

C.     Duran

Victims of human rights abuses sued Marcos in the United States District Court in Hawaii, were certified as a class, and ultimately obtained a nearly $2 billion judgment against the Marcos estate (represented by Imelda Marcos and Marcos's son) in 1995 based on Marcos's perpetration of human rights violations.  Pimentel, 553 U.S. at 857-59 (citing Hilao v. Est. of Marcos, 103 F.3d 767 (9th Cir. 1996) ("Hilao II")); see In re Est. of Marcos Human Rights Litigation, 910 F. Supp. 1460 (D. Haw. 1995).  These plaintiffs, formerly known as the "Pimentel Class" are now known as the "Duran Class."  See In re Arelma, S.A., 2019 WL 3084706, at *2.  In this case, Duran has been granted the right to intervene as a representative of the Duran Class without opposition from the Government.  Id. at *1, 3.

D.     Litigation History

There are three main court actions that have a bearing on the case before us: (1) the case brought by Duran against Marcos for human rights violations; (2) the interpleader action brought by Merrill Lynch to determine ownership of the Arelma Account; and (3) the proceeding in the Sandiganbayan brought by the PCGG to forfeit the Marcos assets.  We briefly discuss each of these court actions next.

---

[4]  We will occasionally refer to Roxas, the Estate of Roxas, and Golden Budha collectively as "Roxas."

4

1.    Suit Brought by Class Against the Marcos in Hawaii

As noted, a class of victims of human rights violations brought a case against Marcos in federal court in Hawaii in 1986.  See Hilao II, 103 F.3d at 771.  In 1991, the Hawaii court certified the case as a class action.  Id.  The class was at one time called the "Pimentel Class," but Duran eventually became the representative of this class.  See Pimentel, 553 U.S. at 857; In re Arelma, 2019 WL 3084706, at *2.  The Hawaii court issued a judgment in 1995 in favor the Pimentel Class against the Marcos Estate in the amount of $1.966 billion.  See Hilao II, 103 F.3d at 772.  It later issued a supplemental judgment deriving from contempt sanctions in the amount of $353.6 million, which was affirmed in 2012.  In re Est. of Marcos Human Rights Litig., 496 F. App'x 759, 759-60 (9th Cir. 2012).

 While the Hawaii case was pending, the district court in 1991 issued a preliminary injunction prohibiting the Marcoses (that is, the Estate and its representatives) from disposing of any of their assets.  See Hilao v. Est. of Marcos, 103 F.3d 762, 763 (9th Cir. 1996) ("Hilao I").  That preliminary injunction became a permanent injunction on February 3, 1995.  Id.  That permanent injunction "expired" in 2005 "pursuant to Hawaii's ten-year statute of limitations for civil judgments."  In re Estate of Marcos Human Rights Litig., 496 F. App'x at 759 n.1 (citing Haw. Rev. Stat. § 657-5).

2.    Interpleader Action Brought by Merrill Lynch

In 2000, Merrill Lynch brought an interpleader action in the District of Hawaii (the "Interpleader Case") seeking to determine the ownership of the Arelma Assets.  Pimentel, 553 U.S. at 859; Merrill Lynch, Pierce, Fenner and Smith, Inc. v. ENC Corp., 464 F.3d 885, 889 (9th Cir. 2006) (subsequent history omitted).  As part of this action, Merrill Lynch deposited the entirety of the Arelma Account, approximately $35 million, with the Clerk of the Court in

Federal Court in Hawaii.  Merrill Lynch, Pierce, Fenner & Smith v. Arelma, Inc., 2004 WL

5326929, at *2 (D. Haw. July 12, 2004).    Roxas and the Pimentel Class were parties, but the

Republic was not due to its sovereign immunity.  See generally ENC Corp., 464 F.3d at 889-90.

On July 12, 2004, the district court issued an order decreeing that all of the assets in the

Arelma Account were awarded to the Pimentel Class.  See id. at *7 (subsequent history omitted).

In 2008, the Supreme Court of the United States vacated this order on the ground that the

ownership of the Arelma Assets could not be decided in the absence of the Republic.  Pimentel,

553 U.S. at 872-73.  The Supreme Court's mandate was issued on June 12, 2008, and the Ninth

Circuit issued its own Order directing the district court to dismiss the Interpleader Case on

August 4, 2008.  See Merrill Lynch, Pierce, Fenner and Smith, Inc. v. ENC Corp., 535 F.3d

1010, 1010 (9th Cir. 2008).  The District of Hawaii ordered an accounting of the assets in the

court's account and eventually issued a series of orders arranging for the interpleaded assets to

be returned to Merrill Lynch.  See Order for Return of Interpleaded Assets, filed Feb. 18, 2009 in

Merrill Lynch, Pierce, Fenner & Smith v. Arelma, Inc., No. 00-cv-595 (D. Haw.) (Docket # 441)

(district court "orders the return of the assets to the stakeholder"); Judgment, dated Feb. 19, 2009

in Merrill Lynch (Docket # 443).  The accounting process was prolonged, and as ultimately

determined by the Ninth Circuit in an appeal, improperly handled.  See Merrill Lynch, Pierce,

Fenner and Smith, Inc. v. Arelma, Inc., 587 F.3d 922, 924 (9th Cir. 2009).  During this period,

the funds were in the "clerk of court's custody."  Id.  This return of the funds to Merrill Lynch

was completed by February 10, 2010.  See Notice That All Funds Have Been Returned, dated

Feb. 19, 2010 in Merrill Lynch, Pierce, Fenner & Smith v. Arelma, Inc., No. 00-cv-595 (D.

Haw.) (Docket # 514).

In October 2008 and November 2012, the Duran Class registered its judgments from the Hawaii action against Marcos and Imelda Marcos in New York.  See Duran 56.1 Statement ¶ 67. Seeking to enforce these judgments, the Class levied on the Arelma Assets by having the Sheriff of New York County serve a Notice of Levy and Restraining Order on Merrill Lynch and the New York City Department of Finance on November 30, 2009, December 10, 2012, January 3, 2013, and July 16, 2013.  See id. ¶ 68.  On April 4, 2009, and June 18, 2013, the Duran class filed separate turnover proceedings under NYCPLR 5225(b) against Merrill Lynch in the Supreme Court of New York, New York County, seeking the Arelma Assets.  See id. ¶ 69; Order, annexed as Ex. 21 to Swift Decl. (Docket # 234-21) ("Swezey Order") (showing filings in Swezey v. Merrill Lynch, No. 104734/2009 (N.Y. Sup. Ct.); Swezey v. Merrill Lynch, No. 155600/2013 (N.Y. Sup. Ct.)); see also Swezey v. Merrill Lynch, 19 N.Y.3d at 549-50.

On January 28, 2010, the judge in the turnover proceeding issued an order directing that the Arelma Assets were to be deposited with the Commissioner of Finance of the City of New York, and that the Arelma Assets would be considered to be "in custodia legis" from that time forward.  See Consent Order, dated Jan. 28, 2010 (Docket # 24-2), at 2.  Merrill Lynch made the deposit of the Arelma Assets with the New York Commissioner of Finance in February 2010. See Swezey Order.  The parties agree that the New York City Department of Finance held the funds from 2010 until 2017, when they were transferred to the New York State Office of the State Comptroller, Office of Unclaimed Funds, see In re Arelma, 2019 WL 3084706 at *2, on the ground that the funds were abandoned property, see Declaration of Michael Sullivan, filed Feb. 1, 2018 (Docket # 24-4), ¶¶ 2-3.

      3.      Philippine Proceeding to Forfeit the Arelma Account

The third main action is the proceeding in the Sandiganbayan.  This action was a petition for "Forfeiture" under Philippine law brought in 1991 in the Sandiganbayan by the Philippine government in an effort to recover the Marcos assets and is referred to as "Case No. 141."  See Petition, dated Dec. 17, 1991, annexed as Ex. 42 to Swift Decl. (Docket # 234-42); Affidavit of Leila M. De Lima, dated Nov. 21, 2019, annexed as Ex. 23 to Swift Decl. (Docket # 234-23) ("Second De Lima Decl."), ¶ 6.  Case No. 141 seemingly ended with a judgment issued more than 20 years later, in 2003, that awarded the Philippine government a forfeiture judgment as to assets held in Swiss bank accounts purportedly funded by Marcos.  See Second De Lima Decl. ¶ 4.

The case lived on, however.  On July 16, 2004, the Philippine government filed a "Motion for Partial Summary Judgment" in Case No. 141 that sought to specifically forfeit the assets in the Arelma Account.  Motion for Partial Summary Judgment, dated July 16, 2004, annexed as Ex. B to Sohn Decl. (Docket # 205-2).  Notice of this motion was given only to the parties to the case, who were Marcos, Imelda Marcos, and Marcos's children.  See id. at 10-11 (listing recipients of notice).  Indeed, according to the uncontested opinion of plaintiff's expert, because the Duran Class (or Pimentel Class at that time) were not parties to Case No. 141, they "could not have been given" notice.  See Expert Report of Herbert Paul J. Francisco, annexed as Ex. 24 to Swift Decl. (Docket # 234-24) ("Francisco Report"), ¶ 24.

Almost five years later, on April 2, 2009, the Sandiganbayan entered a judgment forfeiting the Arelma Account to the Republic "in the estimated aggregate amount of US $3,369,975.00 as of 1983, plus all interests and all other income that accrued thereon, until the time or specific day that all money or monies are released and/or transferred to the possession of the Republic."  Republic of Phil. v. Marcos, annexed as Ex. A to Application (Docket # 1-1)

("Sandiganbayan Judgment"), at *4-57.  That judgment was appealed and on April 25, 2012, the

Philippine Supreme Court affirmed the judgment.  See Romualdez-Marcos v. Republic of Phil.,

annexed as Ex. A to Application (Docket # 1-1), at *61-94.  The Sandiganbayan issued a Writ of

Execution on August 18, 2014.  Writ of Execution, annexed as Ex. A to Application (Docket

# 1-1), at *108-09.

     E.     The Instant Case

In January 2015, the Republic submitted a request for the United States to enforce the

Sandiganbayan forfeiture judgment.  See Affidavit of Leila M. De Lima, annexed as Ex. D to

Application (Docket # 1-4) ("First De Lima Decl.").  Per the procedure stated in 28 U.S.C.

§ 2467(b), the request was certified by the Assistant Attorney General for the Criminal Division

on February 11, 2016.  See Assistant Attorney General Decision, annexed as Ex. A to

Application (Docket # 1-1), at *2.  The United States in turn filed the instant case as an

"Application to Register and Enforce a Foreign Forfeiture Judgment Pursuant to 28 U.S.C. §

2467" in the United States District Court for the District of Columbia on June 27, 2016.  See

Application.  On August 14, 2019, the application was transferred to this District.  See Order,

dated Aug. 14, 2019 (Docket # 33).  Duran was joined to the case as a respondent, see Order,

dated July 15, 2019 (Docket # 31), and Jeana Roxas, as the representative of the Estate of Roger

Roxas, was later joined as well, see Order, dated Jan. 15, 2020 (Docket # 96).

On July 29, 2022, Roxas moved to amend its answer to include four affirmative defenses.

See Notice of Motion, filed July 29, 2022 (Docket # 184).  On February 7, 2023, that motion was

denied.  See Memorandum and Order, filed Feb. 7, 2023 (Docket # 247).

The instant motions followed.

II.    GOVERNING LAW

A.    Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Celotex Corp. v. Catrett, 447 U.S. 317, 323 (1986)); Celotex, 477 U.S. at 322 (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (citations omitted); see also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence").

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party.  Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256, and "[a] party opposing summary judgment does not

10

show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory," Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

B.    Section 2467

This case proceeds under 28 U.S.C. § 2467, which provides the procedure for registration and enforcement of a foreign forfeiture judgment. See 28 U.S.C. § 2467. First, to have a foreign forfeiture judgment registered and enforced by a United States district court under section 2467, the foreign nation must submit a request to the Attorney General. 28 U.S.C. § 2467(b)(1). If the request is certified by the Attorney General or his designee, the Government "may file an application on behalf of a foreign nation in [a] district court of the United States seeking to enforce the foreign forfeiture or confiscation judgment as if the judgment had been entered by a court in the United States." Id. § 2467(c)(1). The Government becomes "the applicant and the defendant or another person or entity affected by the forfeiture or confiscation judgment shall be the respondent." Id. § 2467(c)(2)(A).

Once an application is made, the statute provides that:

[t]he district court shall enter such orders as may be necessary to enforce the judgment on behalf of the foreign nation unless the court finds that — (A) the judgment was rendered under a system that provides tribunals or procedures incompatible with the requirements of due process of law; (B) the foreign court lacked personal jurisdiction over the defendant; (C) the foreign court lacked jurisdiction over the subject matter; (D) the foreign nation did not take steps, in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property . . . in sufficient time to enable him or her to defend; or (E) the judgment was obtained by fraud.

Id. § 2467(d)(1) (emphasis added) (apparent typographical error omitted).  The mandatory

language in section 2467 means that "the court must grant the application unless one of the five

narrow exceptions applies."  In re One Prinz Yacht Named Eclipse, 2022 WL 4119773, at *4

(D.D.C. Sept. 9, 2022) ("Eclipse") (citation omitted).  When determining whether one of the

exceptions applies, "the court shall be bound by the findings of fact to the extent that they are

stated in the foreign forfeiture or confiscation judgment."  28 U.S.C. § 2467(e).

III.    DISCUSSION

    A.    Roxas's Standing

    The Government first moves for summary judgment on the question of Roxas's standing,

alleging that Roxas cannot demonstrate an injury-in-fact that would result from the registration

of the forfeiture judgment.  Gov't Standing Mem. at 3.  Roxas argues that it will suffer injury if

the Philippine forfeiture judgment is registered because the assets or a portion of the assets held

in the Arelma Account derived from the Yamashita Treasure.  E.g., Roxas Standing Opp. at 5-7.[5]

    "Whether a claimant has standing is 'the threshold question in every federal case,

determining the power of the court to entertain the suit.'"  In re Gucci, 126 F.3d 380, 387-88 (2d

Cir. 1997) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).  "If plaintiffs lack Article III

standing, a court has no subject matter jurisdiction to hear their claim."  Cent. States S.E. & S.W.

Areas Health & Welfare Fund. v. Merck-Medco Managed Care, LLC, 433 F.3d 181, 198 (2d Cir.

2005).  "To establish Article III standing, a [party] must show (1) an injury in fact, (2) a

sufficient causal connection between the injury and the conduct complained of, and (3) a

---

[5]  Because we conclude the Estate of Roxas lacks standing for other reasons, as stated below, we do not address the Government's argument that only Golden Budha has any rights to collect on the judgment against the Marcoses, that Golden Budha is not a party to this forfeiture action, and thus that the Estate of Roxas has not suffered any Article III injury.  See Gov't Standing Mem. at 7-8.

likelihood that the injury will be redressed by a favorable decision." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157-58 (2014) (punctuation omitted). "[T]he party invoking federal jurisdiction[] bears the burden of establishing these elements." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).

"[T]he injury-in-fact requirement . . . helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." Susan B. Anthony List, 573 U.S. at 158 (punctuation omitted). "To demonstrate injury in fact, a plaintiff must show the invasion of a [1] legally protected interest that is [2] concrete and [3] particularized and [4] actual or imminent, not conjectural or hypothetical." Strubel v. Comenity Bank, 842 F.3d 181, 188 (2d Cir. 2016) (punctuation omitted).

> In a proceeding under section 2467,
>
> determining whether a claimant has an interest that satisfies constitutional standing requires a two-part inquiry. First, a court must determine the nature of the claimant's interest by looking at the law of the nation in which the interest arose. Then, a court must look to federal law to "determine[ ] the effect of that interest on the claimant's right to bring a claim."

United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 2020 WL 7640213, at *7 (D.D.C. Dec. 23, 2020) ("Baer VIII") (quoting United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 480 F. Supp. 3d 1, 13 (D.D.C. 2020).

To the extent Roxas claims an interest as a result of his judgment against Marcos, this does not confer Article III standing. As the Government notes that Roxas "has not secured its money judgment against the Arelma Assets, by way of lien, levy or other legal attachment," Gov't Standing Mem. at 2, and thus Roxas is a "mere unsecured judgment creditor," id. at 4. Roxas does not contest this point and even appears to concede it. See Roxas Standing Opp. at 4

(arguing that the Government's contention "falls flat" because "[s]ecuring a levy or lien is not the sole way to demonstrate Article III standing").

Case law is clear that a "general unsecured creditor 'does not possess a legal right, title, or interest in the property that is forfeited as required for standing.'" In re 650 Fifth Ave. & Related Props., 2014 WL 1998233, at *4 (S.D.N.Y. May 15, 2014) (quoting DSI Assocs. LLC v. United States, 496 F.3d 175, 184 (2d Cir. 2007)); see United States v. $10,000 in U.S. Currency, 2020 WL 5757471, at *5 (N.D.N.Y. Sept. 28, 2020) ("General creditors do not possess a legal right, title, or interest in the property in forfeiture proceedings, because an interest in property must be an interest in a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account.") (citation omitted); cf. United States v. Agnello, 344 F. Supp. 2d 360, 363 (E.D.N.Y. 2004) ("general creditor" failed to establish "security interest" in payments at issue); United States v. Khan, 129 F.3d 114, 114 (2d Cir. 1997) (summary order) ("[A]ppellants all are essentially unsecured creditors of the owner's seized property, and as such do not have standing to challenge this seizure."). Thus, Roxas's unsecured interest in Marcos's property as a judgment creditor is insufficient to confer Article III standing with respect to the instant case.

Roxas also argues that it has an interest in the assets because Roxas discovered the Yamashita Treasure, and Philippine law grants an interest in treasure to the finder "as a matter of legislatively created right." Roxas Standing Opp. at 6. This is supported by the declaration of Roxas's expert, Diane Desierto, who states that "[u]nder Philippine law, from [the] date [of discovery], through and including the present, Roger Roxas and [Golden Budha] have had a present, actual, identifiable, and legal interest in the treasure and any and all assets accumulated . . . through [the] use of any aspect of the [Treasure]." Declaration of Diane Desierto, filed Oct.

27, 2022 (Docket # 217) ("Desierto Decl."), ¶ 35.  Desierto fails to clearly identify the nature of this "legal interest," however, and Roxas makes no attempt to clarify.  See Roxas Standing Opp. at 6-7.  The Government provides no evidence to contradict Roxas's interpretation of Philippine law.

"[W]hen a claimant responding to a summary judgment motion predicates his claim on an ownership interest, the 'manner and degree of evidence required' [to establish standing] is the 'assertion of ownership' combined with 'some evidence of ownership.'"  Baer VIII, 2020 WL 7649213, at *6 (quoting United States v. $17,900 in U.S. Currency, 859 F.3d 1085, 1090 (D.C. Cir. 2017)).  "When assessing the 'sufficiency and probity of the evidence that purports to demonstrate a colorable ownership interest,' therefore, 'courts generally look to indicia of dominion and control such as possession, title, and financial stake.'"  Id. (quoting United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 959 F. Supp. 2d 81, 100 (D.D.C. 2013)).  The Hawaii court found that Roger Roxas discovered the Yamashita Treasure and that the Treasure was later taken by Marcos.  See Roxas v. Marcos, 89 Haw. at 113-14.  Desierto opines that this interest continues to the present as a matter of Philippine law, which is uncontradicted by the Government.  Roxas has thus provided an "assertion of ownership" and "some evidence" of that ownership with regard to the Treasure.  The Treasure, however, is not necessarily the res subject to forfeiture in this action — instead, the subject of this action is the Arelma Account.  Thus, Roxas's alleged interest hinges on the traceability of the assets in the Arelma Account to the Yamashita Treasure.

The parties agree that the contents of the Arelma Account derive from a single deposit of $2,000,000, made in 1972.  Gov't Standing Mem. at 1; Roxas Standing Opp. at 8, 11 n.4.  Additionally, the parties agree that, at the time, the only portions of the Yamashita Treasure that

had been taken from Roxas were the golden Buddha statue, 17 bars of gold, and "three handfuls" of uncut diamonds.  Roxas Standing Opp. at 8; Gov't Standing Mem. at 5.  Roxas alleges that the "Arelma deposit was derived (either in whole or in substantial part) from the . . . 17 bars of gold and the three handfuls of diamonds."  Roxas Standing Opp. at 9.  While the parties agree that the value of the gold bars was adjudged to be approximately $9,305, see Roxas Standing 56.1 Response ¶ 5, they do not agree on the value of the diamonds.

Roxas provides the following as evidence that the Arelma Assets derived from the portion of the Yamashita Treasure taken by Marcos in 1971 as described in Roxas v. Marcos, 89 Haw. at 101-02.   First, Roxas notes that a forensic accountant named John W. Buckley once testified that "[t]he most likely source" of the Arelma Assets was "the treasure that the Japanese left buried . . . when they exited [the Philippines]."[6]  See Roxas Standing Opp. at 12.  Second, Roxas notes that Imelda Marcos publicly stated, including in prior legal proceedings, that the Marcos family's wealth was derived in part from the Yamashita Treasure.  Id. at 15.  Finally, he argues that there is "no . . . proof" that the Marcos family had any source of "excess wealth, other than that which was taken from Roxas" prior to the 1972 Arelma deposit.  Id. at 20.  We address each of these in turn.

### 1.    Testimony of Buckley

As to the testimony of forensic accountant John Buckley, Buckley is deceased and thus cannot testify.  His deposition appears in the record, see Deposition of John Buckley, annexed as Ex. M to Robbins Decl. (Docket # 211-13) ("Buckley Dep."), but is admissible under Fed. R. Civ. P. 32 only if the case in which it was taken involves "the same subject matter between the

---

[6]  Although Roxas identifies Buckley as a "percipient witness," Roxas Standing Opp. at 13, there is no indication on the record that Buckley had firsthand knowledge of any underlying events in this case.

same parties, or their representatives or successors in interest," Fed. R. Civ. P. 32(a)(8).  "The

'same subject matter' and 'same party' requirements have been 'construed liberally in light of

the twin goals of fairness and efficiency.'"  Fed. Housing Fin. Agency v. Merrill Lynch & Co.,

2014 WL 798385, at *1 (S.D.N.Y. Feb. 28, 2014) ("FHFA") (citing Hub v. Sun Valley Co., 682

F.2d 776, 778 (9th Cir. 1982)); accord District Attorney, 307 F. Supp. 3d at 209.

 Here, Buckley's deposition was conducted in the Interpleader Case, to which neither the

Republic nor the Government was a party.  See Pimentel, 553 U.S. at 859 (Republic asserted

sovereign immunity in the Interpleader Case).  Thus, the requirement that "the same parties, or

their representatives or successors in interest" be involved in both cases is not obviously

satisfied.  Roxas argues that the analysis in District Attorney, where the court found the Buckley

deposition admissible on summary judgment, has equal force here.  Roxas Standing Opp. at 13.

In that case, Roxas sought to offer Buckley's testimony against the Duran Class in a dispute

relating to assets purchased by the Marcos family.  See District Attorney, 307 F. Supp. 3d at

205-06, 10.  The court noted that Duran, as a judgment creditor of Marcos — a party in the

Interpleader Case — "st[ood] in the shoes of [the] judgment debtors" in relation to Roxas.  Id. at

210.  Accordingly, the court found that the testimony was admissible under Rule 32 because the

Duran Class or "their predecessors in interest — Mr. and Mrs. Marcos — were represented and

had the same motive to cross-examine the deponent" as Duran did in the District Attorney action.

Id. (punctuation omitted).  Thus, the court found that the "same party" requirement was satisfied.

Id.  Here, however, the opposing party is the Government, which is not a judgment creditor of

the Marcos family and was not a party to the Interpleader Case.  As such, the argument that the

Government is Marcos's "successor in interest" cannot be made on the same grounds as applied

in the District Attorney action.  Instead, we must undertake a fresh analysis of whether under the

liberal construction contemplated by case law the Government is a successor in interest to the Marcos defendants.

When considering whether to admit a deposition from a prior lawsuit, "courts have adopted a 'realistically generous approach over one that is formalistically grudging,' admitting testimony where 'it appears in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination.'" <u>FHFA</u>, 2014 WL 798385, at *1 (quoting <u>Lloyd v. Am. Export Lines, Inc.</u>, 580 F.2d 1179, 1187 (3d Cir. 1978)) (punctuation omitted). "To be 'similar,' the motives to develop the testimony should be 'of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue.'" <u>Id.</u> (quoting <u>United States v. DiNapoli</u>, 8 F.3d 909, 914-15 (2d Cir. 1993)). In the Interpleader Case, the Marcos defendants had, as the court in <u>District Attorney</u> explained, a motive "to establish that Mr. Marcos had not stolen Roxas's treasure or, in the alternative, that whatever was stolen was of little value." 307 F. Supp. 3d at 210. That is not the Government's motive here; instead, the Government here has a motive to show that the portion of treasure stolen before the Arelma deposit was made was not the source of the Arelma deposit. Thus, we cannot say that the same "motive" for cross-examination existed in both cases.

But even if it were admissible under Rule 32, the testimony suffers from two separate defects. First, Buckley is not being offered as a fact witness but rather as an expert witness. <u>See, e.g.</u>, Roxas Standing Opp. at 12. However, Roxas did not make the required expert disclosure regarding this testimony by the deadline in the instant case. Second, Buckley's testimony does not provide competent evidence as to the source of the Arelma Assets. Buckley testified to his opinion that the Yamashita Treasure was "the most likely source of most of the wealth that

Marcos accumulated," including the Arelma Assets. Buckley Dep. at 33:12-17. But his deposition testimony provides no reasonable support for this conclusion. Although Roxas cites Buckley's explanation that Marcos must have possessed the Treasure given his attempts "to sell gold worth . . . in excess of a trillion dollars," Buckley Dep. at 32:12-16; see Roxas Standing Opp. at 12, this testimony gives no context as to when this gold was acquired, and Roxas acknowledges that the "vast bulk" of the Treasure had not been recovered at the time of the Arelma deposit, see Roxas Standing Opp. at 8. As to Buckley's conclusion that "[t]he other source[s]" that may have formed the Arelma deposit, including "reparations that the Philippines received from Japan or . . . siphoning off of . . . aid money that the U.S. sent to the Philippines," were "small in comparison to the [T]reasure," Buckley Dep. at 33:15-23, this testimony again fails to address the timing of the acquisition or the traceability of the Treasure to the $2,000,000 Arelma deposit.

Indeed, Buckley testified that he "was not asked to trace gold or the treasure," and did not know if anyone had ever attempted to trace the source of the Arelma deposit. Id. at 33:2-11. Buckley testified that because he "was not asked to investigate the [Yamashita] [T]reasure," he "didn't do any independent investigation of it." Id. at 47:22-24. Because Buckley's opinion was based on no "independent investigation," and by his admission he did not investigate the source of these assets at all, a reasonable factfinder could not use his testimony to conclude that the Arelma assets are traceable to the Yamashita Treasure. See S.E.C. v. Yorkville Advisors, LLC, 305 F. Supp. 3d 486, 504 (S.D.N.Y. 2018) ("[E]xpert testimony that rests on merely subjective belief or unsupported speculation is inadmissible and should be precluded.") (citation omitted). Thus, Buckley's testimony sheds no light on whether the particular deposit at issue here derived from the Treasure, much less the portion seized from Roxas in 1971.

2.    <u>Marcos's Public Statements</u>

Roxas provides various public statements by Imelda Marcos and her representatives in which Marcos claimed that the Marcos family fortune was derived from the Yamashita Treasure, and argues that these statements show the Arelma deposit must be traceable to Roxas's discovery. <u>See</u> Roxas Standing Opp. at 15. Roxas points to the opening statement made by Imelda Marcos's attorney in New York criminal proceedings, where counsel forecast that a witness would "tell [the jury] that part of [Ferdinand Marcos's] wealth came from the discovery of what is called the Yamashita gold hoard." Transcript, annexed as Ex. G to Robbins Decl. (Docket # 211-7) ("Marcos Tr."), at 110:14-24. Roxas argues that this statement is a judicial admission, and thus is conclusive proof that the Yamashita Treasure was the source of Marcos's assets. Roxas Standing Mem. at 15. Assuming <u>arguendo</u> that this is correct and that the statement was admissible, the statement still does not provide any information regarding the origins of the Arelma deposit. It shows only that "part" of Marcos's wealth came from the Yamashita Treasure, without reference to time frame or any indication that the portion of the wealth at issue was used to fund the Arelma Account — in short, the statement provides no proof for the assertion that the res at issue here is traceable to the Yamashita Treasure stolen before 1972.

Although Roxas also states that "the Marcos family and its cronies have made many similar assertions" in other proceedings, Roxas Standing Opp. at 15-16, Roxas cites only to its expert witness's testimony regarding a news article in which Imelda Marcos allegedly stated that "some of the gold her husband had was [the] legendary Yamashita treasure," Deposition of Diane Desierto, annexed as Ex. J to Robbins Decl. (Docket # 211-10) ("Desierto Dep."), at 120:15-24. Setting aside the issue of whether this statement would ever be admissible, this

statement is no more persuasive as to the origins of the Arelma deposit than the last.  It gives no

information as to when the wealth was allegedly gained and makes no reference to the Arelma

deposit.  Additionally, it says that only "some" of the gold came from the Treasure.

Thus, the statement would not allow a finding that the Arelma Assets were derived from

the portion of Treasure taken from Roxas prior to 1972.

### 3.    Other Sources of Assets

Finally, Roxas argues that "[w]hen one considers the timing" of the 1971 seizure of the

Yamashita Treasure and 1972 Arelma deposit, "coupled with the fact that the earliest and only

judicially confirmed occurrence of Marcos [seizing property] . . . is the 1971 Marcos Raid on

Roxas'[s] home, one is left with a strong inference . . . that the Arelma deposit was derived

(either in whole or in substantial part) from the [] 17 bars of gold and the three handfuls of

diamonds."  Roxas Standing Opp. at 8-9.  Roxas notes that "Marcos'[s] tax returns during the

period . . . reflect only modest legitimate earnings and there is no evidence that Marcos earned or

inherited any legitimate substantial wealth prior to taking office."  Id. at 18 (citing

Sandiganbayan Judgment).  As further evidence of its theory, Roxas points only to the absence

of proof that different funds were used to create the Arelma deposit.  See id. at 17-18.  Roxas

asserts that because the Arelma account deposit occurred shortly after Marcos declared martial

law, "it is unlikely that the Arelma account was funded by any 'ill-gotten' wealth . . . acquired

during martial law."  Id. at 18.  Roxas argues that, in sum, "this creates a very strong inference"

that the Arelma Assets are traceable to the 1971 seizure of the Yamashita Treasure.  Id.

Although the Government acknowledges that "it is theoretically possible that the 17 gold

bars were liquidated and used to purchase a small portion of the Arelma Assets," it nonetheless

argues that "Marcos could have equally funded such a tiny sliver of the Arelma Assets through

virtually any tranche of licit or illicit wealth."  Gov't Standing Reply at 3.  The Government points to several reports that suggest Marcos had accumulated some of his wealth prior to the 1971 seizure.  See Stolen Asset Recovery (StAR) Initiative: Challenges, Opportunities, and Action Plan (June 2007), https://www.unodc.org/documents/corruption/StAR-Sept07-full.pdf, at 20 ("Marcos started accumulating his ill-gotten wealth in 1965."); Ferdinand Marcos' Daughter Tied to Offshore Trust in Caribbean, Int'l Consortium of Investigative Journalists (Apr. 2, 2013), https://www.icij.org/investigations/offshore/ferdinand-marcos-daughter-tied-offshore-trust-caribbean/ (Marcos's use of illicit funds in 1968); David A. Chaikin, Controlling Corruption by Heads of Government and Political Elites, in Corruption and Anti-Corruption 97, 97-99 (Peter Larmour & Nick Wolanin eds., 2001), https://www.jstor.org/stable/pdf/j.ctt2tt19f.9.pdf (Marcos siphoned U.S. foreign aid in the 1960s); Nick Davies, The $10bn Question: What Happened to the Marcos Millions?, The Guardian (May 7, 2016), https://www.theguardian.com/world/2016/may/07/10bn-dollar-question-marcos-millions-nick-davies (describing the Marcos accounts as "loaded" with funds "[b]y February 1970").  The Government gives no explanation as to why these documents are admissible, however.  The Government also points to a decision by the Ninth Circuit in which the court explained that the Marcos family had disposed of $400,000 in assets through foreign funds and accounts as early as 1970.  See Republic of Phil. v. Marcos, 862 F.2d 1355, 1362-63 (9th Cir. 1988).

We will assume, arguendo, that Roxas has shown that it is more likely than not (1) that the Arelma Assets and 1971 seizure assets were both in Marcos's possession in 1972, (2) that Marcos's tax returns reflect no legitimate income sufficient to be the source of the Arelma deposit, and (3) that in 1971 the Marcos family had not yet gained any wealth as a result of martial law seizures.  The problem is that these facts simply do not allow a reasonable inference

22

that the Arelma Assets are derived from the 1971 seizure. Any such inference requires the assumption that the Marcos tax returns would necessarily show previously accumulated wealth and that the Marcos's had no source of income other than martial law seizures. Nothing in the record supports this assumption, however. This is particularly true here where the gold bars have been valued at only $9,305 and there is no competent valuation of the remaining Treasure that was taken.

In sum, a finding that the Arelma deposit came from the 1971 seizure of the Yamashita Treasure would rest on speculation rather than any reasonable inference. Because a reasonable factfinder could not find that the Arelma Account was funded by the Treasure seized in 1971, Roxas does not have standing to challenge the recognition of the Philippine action. Accordingly, the Government's motion seeking to dismiss Roxas for lack of standing should be granted.

Notwithstanding the above, Roxas raises no arguments challenging the forfeiture that have not also been raised by Duran. Because we find for the reasons stated below that the Government's application must be granted, whether or not Roxas has standing has no practical significance for the disposition of this case.

B.    Government Summary Judgment Motion

The Government has moved for summary judgment on Duran's Second, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Affirmative Defenses, and Roxas's First and Third Affirmative Defenses. See Gov't SJ Mem. The defenses at issue fall into three categories: those contemplated by section 2467, those not contemplated by the statute, and Duran's request to limit the enforcement amount if the application is granted. See Answer, filed Sept. 11, 2019 (Docket # 35) ("Duran Ans."); see also Gov't SJ Mem. We address each in turn.

23

1.    Section 2467 Defenses

As noted, section 2467 provides that:

> The district court shall enter such orders as may be necessary to enforce the
> judgment on behalf of the foreign nation unless the court finds that — (A) the
> judgment was rendered under a system that provides tribunals or procedures
> incompatible with the requirements of due process of law; (B) the foreign court
> lacked personal jurisdiction over the defendant; (C) the foreign court lacked
> jurisdiction over the subject matter; (D) the foreign nation did not take steps, in
> accordance with the principles of due process, to give notice of the proceedings to
> a person with an interest in the property . . . in sufficient time to enable him or her
> to defend; or (E) the judgment was obtained by fraud.

28 U.S.C. § 2467(d)(1).  Of these five defenses, Duran alleges three: that the Sandiganbayan did

not provide adequate notice to the Duran Class, that the judgment was obtained by fraud, and

that the Sandiganbayan lacked jurisdiction over the Arelma Assets.  See Duran Ans. ¶¶ 27, 39,

45.  We address each of the statutory defenses next.

a.    Notice

Duran's Fifth Affirmative Defense argues that the Philippine Republic "failed to give any

notice, consistent with the principles of due process, of the Arelma forfeiture proceeding . . . to

the members of the [Duran] Class."  Duran Ans. ¶ 45.  The parties disagree as to whether United

States law or Philippine law regarding due process controls the question of whether notice was

adequate.  See Gov't SJ Mem. at 7; Roxas SJ Opp. at 4; Duran SJ Opp. at 11.  We therefore first

address the appropriate choice of law before turning to the merits.

i.    Choice of Law

The Government argues that "the phrase 'due process' in section 2467 is measured

according to U.S. due process standards," under which "if the litigation procedures employed by

the foreign nation are 'analogous' to procedures that are permissible in U.S. litigation, . . . the

foreign nation's procedures satisfy due process for the purposes of Section 2467."  Gov't SJ

Mem. at 7 (quoting In re Restraint of All Assets Contained or Formerly Contained in Certain Inv. Accounts at UBS Fin. Servs., Inc., 860 F. Supp. 2d 32, 42 (D.D.C. 2012) ("UBS")).  Duran does not provide a choice of law analysis, arguing only that "the Republic failed to give notice to Class members as required by both United States and Philippine law."  Duran SJ Opp. at 11.

The few cases that have considered the issue of "due process" under section 2467 all appear to consider whether the foreign process was consistent only with United States' standards of due process, not a foreign country's standards.  See In re $6,871,042.36, 2021 WL 1208942, at *5 (D.D.C. Mar. 31, 2021) (considering whether Brazilian forfeiture proceedings gave claimants "an opportunity to be heard"); Eclipse, 2022 WL 4119773, at *5 (finding with regard to section 2467(d)(1)(A),[7] that Spanish due process procedures were "consistent with the requirements of due process in the United States"); In re Seizure of Approximately $12,116,153.16 and Accrued Interest in U.S. Currency, 903 F. Supp. 2d 19, 34 n.15 (D.D.C. 2012) ("$12,116,153.16") ("[T]he proceedings in Brazil appear to meet the requirements of due process under U.S. law."); UBS, 860 F. Supp. 2d at 42 ("the procedures employed to obtain the [foreign] [o]rder . . . [were] analogous to procedures used in the United States," and were "not incompatible with due process" where they "have analogs in our own legal system") (analyzing § 2467(d)(1)(A) and § 2467(d)(3)(A)(ii)(I), which incorporates (d)(1)(A) by reference).

We agree that section 2467's invocation of "due process" must be intended to refer to notions of due process under United States law, rather than foreign law.  This is particularly true since "due process" is a well-understood concept in United States law and Congress likely did

---

[7]  Section 2467(d)(1)(A) provides a defense where "the judgment was rendered under a system that provides tribunals or procedures incompatible with the requirements of due process of law," as contrasted with section 2467(d)(1)(D)'s defense that "the foreign nation did not take steps, in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property . . . in sufficient time to enable him or her to defend."

not believe that the same concept was expressed in the law of the many dozens of foreign

countries whose judgments might be at issue in section 2467 proceedings.  Further, if a foreign

government's notion of "due process" was anathema to our own — for example, a regime that

charged an exorbitant filing fee to contest the forfeiture — we have little doubt that Congress

intended that the lack-of-due-process defense would be satisfied.  Thus, we consider only

whether the notice provided in this case comports with due process under United States law.

ii.   <u>Merits</u>

Duran argues that although "the [Duran] Class was an interested party [with regard to the

Arelma Assets] beginning in November 1991," "[t]he Republic neither gave notice of the

[motion for summary judgment] to the Class members nor attempted to give them notice."

Duran SJ Opp. at 11-12.

Section 2467(d)(1)(D) provides that a foreign judgment should not be registered if "the

foreign nation did not take steps, in accordance with the principles of due process, to give notice

of the proceedings to a person with an interest in the property . . . in sufficient time to enable him

or her to defend."  We begin by assessing whether Duran was a "person with an interest in the

property" under section 2467.   Because, as described below, Duran was not a person with "an

interest" in the Arelma Assets, we need not address whether he was given notice.

I.   <u>Timing of Interest</u>

Duran provides no framework for how a court should determine under section 2467

whether a party has an "interest," and acknowledges that the statute itself "does not elaborate on

the nature or extent of the interest a person must have."  Duran SJ Opp. at 11.  Nonetheless, the

first issue we must address is at what point the existence of the "interest" should be evaluated.

The Government argues that what matters is not whether Duran has gained an interest in the

26

Arelma Assets since the Sandiganbayan judgment, but rather whether Duran had an interest at a time when due process required the Republic to give notice of the Sandiganbayan proceedings before they occurred.  See Gov't SJ Reply at 13 & n.6.  Although there appears to be no case law addressing this question, we believe that the Government's contention is the only reasonable interpretation of the statute.  If section 2467's notice requirement applied to interests existing after the decision was rendered, the requirement that the foreign nation "take steps . . to give notice . . . in sufficient time to enable [the interested person] to defend" would be impossible to satisfy.  See 28 U.S.C. § 2467(d)(1)(D).  Thus, the relevant question is whether Duran had an interest at some time before the Sandiganbayan judgment was rendered on April 2, 2009.

This does not dispose of the timing question, however, because the parties still disagree on whether the existence of a party's interest at the time of judgment is necessary as long as the interest existed at some time before the date of judgment.  The Government argues that, unless Duran's interest existed at the time the Sandiganbayan judgment was rendered — that is, April 2, 2009 — Duran's defense must fail.  Gov't SJ Reply at 13.  Duran counters that the relevant date on which the Class must have had an interest is the date of filing of the motion for partial summary judgment in this case: that is, July 16, 2004.  Duran Cross-Mot. Mem. at 12.  The Government's argument is premised on the contention that "when a court forfeits property in which a challenger has no present interest, the challenger is not harmed by the court's decision. . . . even if the challenger had an interest in the property at some earlier time."  Gov't SJ Reply at 14 (emphasis added).  Although the Government acknowledges that "a court should determine interested parties at an early stage of proceedings, so that they can be provided with notice," it argues that in a section 2467 proceeding, "a putative challenger was not harmed by the foreign forfeiture judgment unless she had an interest in the property at the time of the foreign

27

judgment." Id. Thus, the Government argues that if the Duran Class lacked an interest on April 2, 2009, when the assets were forfeited, it was not an "interested party" under section 2467(d)(1). See id. Duran responds that the Government's argument is "nonsensical," because "[t]he point of giving notice is for the court to receive and consider the positions of persons with an interest." Duran Cross-Mot. Mem. at 12.

We believe this question must be answered in light of the purpose of section 2467 and the notice defense. See generally Abramski v. United States, 573 U.S. 169, 179 (2014) (when interpreting a statute, courts should look "to the statutory context, structure, history, and purpose"). The purpose of the notice requirement was surely to give a party with an actual interest in the property a chance to persuade the foreign court to recognize their interest — not to penalize a foreign government for failing to jump through a pointless procedural hoop. We will assume arguendo that the Duran Class had in interest in the Arelma Assets in 2004. If the Duran Class in fact had an interest in the Arelma Assets at the time of the forfeiture in 2009, notice to the Duran Class in 2004 would potentially have achieved the purpose contemplated by the statute; that is, to allow the Duran Class an opportunity to be heard by the Sandiganbayan before it issued its judgment. But if the Duran Class did not have such an interest at the time of the judgment in 2009, the Duran Class was not harmed by the failure to have notice of the proceeding and thus could not claim that it was denied appropriate process. In light of the complete lack of harm in this latter scenario, we do not believe it was the intention of section 2467 to have U.S. courts refuse to recognize a foreign forfeiture judgment simply because the foreign court failed to give notice to a party that had no interest in the property at the time it was actually forfeited.

II.     Whether Duran had an Interest on April 2, 2009

We thus turn to whether the Duran Class had an interest in the property on April 2, 2009, at the time the forfeiture judgment was made.  Duran presents a series of arguments as to why "the Class had an interest in the Arelma Assets beginning no later than November 1991 . . . [and] continu[ing] unabated to the present."  Duran Cross-Mot. Mem. at 9.  First, Duran asserts that in 1991, the District of Hawaii "enjoined any transfer or dissipation of the [Marcos] Estate's assets," id. at 8 (citing Hilao II, 103 F.3d at 771), after which "[i]n February 1995, the injunction became permanent upon entry of the final judgment," id. (citing Hilao I, 103 F.3d at 763).  Subsequently in 2000, Merrill Lynch "deposited the Assets" with the District of Hawaii, and in 2004, "the Class prevailed . . . and judgment was entered awarding title to the Class and directing transfer of the Assets to the Class[] Settlement fund held by the Clerk of Court."  Id. (citing Merrill Lynch v. Arelma, 2004 WL 5326929, at *7).  Although Duran acknowledges that the "Supreme Court reversed the [District of Hawaii] judgment" in 2008 and "remanded the case to the Ninth Circuit with directions to dismiss the case and transfer the Arelma Assets to Merrill Lynch," id. at 9 (citing Pimentel, 553 U.S. at 851), Duran asserts that "the transfer was piecemeal" and the Assets were not transferred in full until February 2010, id.  Duran asserts that the Class "transferred its first judgment" to this District, and subsequently to state court, and then "levied on the Arelma Assets" beginning on November 30, 2009.  Id. (citing Swezey, 2009 WL 4009121; Duran R. 56.1 Statement ¶¶ 66-69).  Finally, Duran points to the D.C. District Court's prior ruling in this matter, id., in which Judge Leon found that "[t]his levy means the Duran Class is not merely a general unsecured creditor — it has a specific interest in the Arelma funds."  See In re Arelma, 2019 WL 3084706, at *3.

29

We conclude, however, that none of these circumstances show that Duran had an interest in the property as of April 2, 2009.

First, the injunction against the Marcoses requiring that they not dissipate their assets does not show an interest in 2009 because the judgment expired in 2005. See In re Est. of Marcos Human Rights Litig., 496 F. App'x at 759 n.1.[8]

Next, the results of the Interpleader Case do not show an interest in the Arelma Account in 2009 because the Supreme Court required dismissal of that action in 2008. The Supreme Court's mandate was issued on June 12, 2008. See Pimentel, 553 U.S. at 873. While the district court took a long time to fulfill the seemingly ministerial task of returning the funds to Merrill Lynch, it cannot be said that the Duran Class had any "interest" in these funds during this period — or, more precisely, that the Duran Class had an interest in the funds that were actually returned to the Arelma Account and that are thus the subject of this section 2467 proceeding. This is because the Supreme Court's decision and mandate definitively determined that the interpleader judgment had improperly adjudicated that the Duran Class had an interest in the funds, even if those funds were not returned to Merrill Lynch until later. As the Ninth Circuit noted, during this period the funds were merely in the "clerk of court's custody," see Merrill Lynch v. Arelma, 587 F.3d at 924, and cannot be said to have been the property of the Duran

_____

[8] Even if it had not expired, we question whether a broad injunction against dissipation of any assets would constitute an "interest" in particular property requiring a forfeiture court to give notice to the party that obtained such an injunction. Notwithstanding an injunction of this kind, the party remains a "general creditor," and it is well settled that a general creditor does not have an interest in property subject to a forfeiture action. See In re 650 Fifth Ave. & Related Props., 2014 WL 1998233, at *4; United States v. Schwimmer, 968 F.2d 1570, 1581 (2d Cir. 1992) ("We turn then to the question of whether a general creditor has an interest in property ordered forfeited that invalidates an order of forfeiture. We hold that it does not.").

Class at any time after the Supreme Court's mandate issued on June 12, 2008, <u>Pimentel</u>, 553 U.S. at 857.[9]

As to the levies, we will assume <u>arguendo</u> that the Duran Class's levy on the Arelma Assets reflected an interest in the Arelma Account. But the levies do not help the Duran Class because the first levy did not occur until November 30, 2009, <u>see</u> Duran 56.1 Statement ¶ 68, months after the April 2, 2009, forfeiture judgment.

Finally, Duran points to a 2019 ruling of Judge Leon stating that a Duran Class levy "means the Duran Class is not merely a general unsecured creditor — it has a specific interest in the Arelma funds." <u>In re Arelma</u>, 2019 WL 3084706, at *3. In other words, Judge Leon found a continuing "interest" in the Arelma Assets as of 2019 based on the levy. This statement, however, was merely an assessment of the interest that the Duran Class had at the time it sought to intervene in 2019, not the interest as of the date relevant to the section 2467 analysis here — that is, April 2, 2009.[10]

For these reasons, we find that the Duran Class did not have an "interest" in the property within the meaning of section 2467(d)(1)(D) and thus no notice was required to be given to the class. As a result, the Government should be granted summary judgment as to Duran's Fifth Affirmative Defense.

---

[9] We note that the view of Duran's expert was that any interest Duran had in the Arelma Assets under Philippine law was "based on [the] U.S. Federal Court decision" — presumably referring to the interpleader decision. <u>See</u> Francisco Report ¶ 22. Thus, Philippine law does not support the notion that the Duran class had an interest in those assets.

[10] Additionally, Judge Leon was assessing the "injury-in-fact" requirement of Article III not the "interest" requirement of section 2467(d)(1)(D) and it is not clear that the standards for evaluating a party's interest in these circumstances are the same. <u>See</u> <u>In re Arelma</u>, 2019 WL 3084706, at *3.

b.      Fraud

Section 2467(d)(1)(E) requires that a foreign judgment of forfeiture not be recognized if it "was obtained by fraud."  As to the law that governs this defense, the Government cites case law applying Fed. R. Civ. P. 60(b)(3) — allowing for relief from a judgment for "fraud" — which has been articulated as the "fraud on the court" standard.  See Gov't SJ Mem. at 18.  Duran cites to case law involving civil claims of fraud by one party against another party.  See Duran SJ Opp. at 32.  We believe the "fraud on the court" standard is most analogous to the fraud defense in section 2467(d)(1)(E) inasmuch as the fraud at issue in that defense is specifically a fraud aimed at obtaining a judgment from a court.

Under that standard, "fraud on the court"

> " . . . is limited to fraud which seriously affects the integrity of the normal process of adjudication."  [Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir. 1988)] (citing Kupferman v. Consol. Research & Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir. 1972)).  Fraud upon the court should embrace "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases."  Hadges[ v. Yonkers Racing Corp.], 48 F.3d [1320,] 1325 (quoting Kupferman, 459 F.2d at 1078 (internal quotation marks omitted)).  Fraud upon the court must be established by clear and convincing evidence.  See Madonna v. United States, 878 F.2d 62, 65 (2d Cir. 1989).

King v. First Am. Investigations, Inc., 287 F.3d 91, 95 (2d Cir. 2002).

Duran's Fourth Affirmative Defense argues that the Sandiganbayan judgment "was obtained by fraud" because the Republic "fil[ed] the claim for forfeiture of the Arelma Assets . . . despite having received full payment" as a result of a prior settlement agreement with Campos, and failed to inform the Philippine court that this settlement existed.  Duran Ans. ¶¶ 39-41.

As an initial matter, we do not see how the filing of the claim for forfeiture can by itself constitute a "fraud" on the court.  We thus address only the question of whether there was a fraud

on the Court because the PCGG "fail[ed] to inform the Sandiganbayan that the Republic had been fully compensated for its claim to the Arelma Assets."  Duran SJ Opp. at 30.

Duran's argument is premised on a 1986 settlement agreement between the Republic of the Philippines and Campos, an individual Duran describes as "a Marcos co-conspirator."  Id. at 30-31.  As part of this settlement, Duran avers that Campos "paid the Republic $15 million and transferred stock . . . with a total value of about $115 million."  Id. at 31.  Duran argues that this settlement "fully satisfied the Republic's claim that the money in the Arelma [A]ccount was the product of a conspiracy by Marcos and Campos to misappropriate the Republic's money" and, per a 1989 ruling of the Philippine Supreme Court, the amount of that settlement should have been applied as "a credit toward any damages assessed against a joint tortfeasor" such as Marcos.  Id. at 31-32.  Duran argues that the Republic's failure to disclose the settlement to the Sandiganbayan constituted an attempt to seek double recovery, and thus by filing the motion for summary judgment before the Sandiganbayan and "representing its entitlement to forfeiture of the Arelma Assets, the Republic committed fraud."  Id. at 33.

The Government argues that the settlement was, in fact, disclosed to the Sandiganbayan, and that in any event the Sandiganbayan would have been aware of the settlement and its implications through other sources.  Gov't SJ Mem. at 18-19.  To the extent that Duran's argument relies upon the contention that the Sandiganbayan was not informed of the purported "credit" resulting from the Campos settlement, the Government argues that the applicability of the "credit" principle is questionable.  Id. at 21.  Finally, the Government argues that even if the "credit" principle applied to the Sandiganbayan judgment, the amount of the credit was insufficient to satisfy the Sandiganbayan judgment, and the Arelma Assets would still be forfeitable.  Id. at 22-23.

We need not reach all of the Government's arguments because we cannot find that the Philippine courts were in any way the victim of a "fraud on the court" based on the alleged failure to disclose the Campos settlement or to make the argument that the Marcoses were due credit from that settlement.

To put it simply: there can be no "fraud on the court" where any alleged omission was contained in documents the party actually presented to the Court or where the Court made clear that it was aware of the allegedly omitted information.  See Weldon v. United States, 225 F.3d 647, 647 (2d Cir. 2000) (summary order) ("All of [appellant's] allegations of 'fraud' in this case amount to a general claim that defense counsel mischaracterized the applicable law, and the evidence and affidavits submitted to the district court.  Even assuming everything that [appellant] claims is true, this does not rise to the level of fraud on the court."); see also Wu v. Lehman Brothers Holdings Inc., 2022 WL 3646207, at *2 (S.D.N.Y. Aug. 24, 2022) ("[A] litigant's selective quotation of documents that are available in full on the public docket is far afield from the type of conduct that would constitute fraud under either Rule 60(b)(3) or 60(d)(3).").  Here, the Sandiganbayan judgment notes that the "assets, funds, and property involved in the Republic's forfeiture petition" included "[p]roperties surrendered to the government by Marcos crony Jose Y. Campos."  Sandiganbayan Judgment at *32 & n.25.  In addition, the Republic's petition to the Sandiganbayan annexed a letter which states, inter alia, that Campos agreed to deliver tract titles, stock shares, and cash to the Republic as a "compromise settlement."  Campos Settlement Let., annexed as Ex. J to Second Sohn Decl. (Docket # 206-4), at *5-6.  Finally, a 1989 decision of the Philippine Supreme Court made public the terms of the Campos settlement, including that Campos was to "pay a sum of money" and "surrender . . . properties and assets disclosed and declared by him to belong to . . . Marcos" in return for release from liability.

<u>Republic of Phil. v. Sandiganbayan</u>, annexed as Ex. K to Second Sohn Decl. (Docket # 206-5) ("1989 PSC Decision"), at *14-15.  In light of these circumstances, we do not see how the Sandiganbayan or the Philippine Supreme Court could be characterized as a victim of fraud on the court.  We reject Duran's argument that the motion for partial summary judgment itself had to annex these documents (rather than appearing in the initial petition), because the documents were obviously available to the courts, and if they were in fact legally or factually relevant, the adverse party (the Marcoses) could certainly have used them to their advantage.  Of course, the Philippine Supreme Court's 1989 opinion referencing the terms of the Campos settlement was plainly sufficient to apprise the Sandiganbayan of its existence, particularly where the Sandiganbayan was itself a party to that case.  <u>See</u> 1989 PSC Decision.

To the extent that Duran argues that the Republic failed to disclose the applicability of the "credit" to the Sandiganbayan, as reflected in the 1989 Supreme Court Opinion, we do not see how an alleged failure to disclose a legal principle to a court can constitute a "fraud" on that court within the meaning of section 2467.  The Republic cannot possibly have concealed the principles of law embodied in a Philippine Supreme Court decision from the Sandiganbayan.[11]

---

[11]    Additionally, we do not follow Duran's credit argument.  Duran argues that the Campos settlement amount should be deducted from liability for "alleged misappropriations by Marcos and Campos as joint tortfeasors."  Duran SJ Opp. at 35.  Duran characterizes the 1989 Decision as stating that "the Campos settlement credit applied only to damages for which Marcos and Campos were conspirators <u>and jointly and severally liable</u>."  <u>Id.</u> at 36 (emphasis added).  As Duran acknowledges, however, the motion for partial summary judgment that was the basis for the Sandiganbayan judgment was "specific to the Arelma Assets only."  <u>Id.</u> at 35.  In other words, it was not an action for damages based on torts committed by Marcos or Campos, but rather an <u>in rem</u> action for the forfeiture of a specific res — the Arelma Assets.  <u>See</u> Sandiganbayan Judgment at *39-41, 43 ("[P]etitioner's [motion] . . . can be considered as seeking separate judgment with respect to the Arelma [A]ssets only. . . . [T]his forfeiture proceeding is an action <u>in rem</u>.").  Thus, even if Duran were correct about the existence of a "credit," it would not apply here, where neither Marcos nor Campos was the subject of the Sandiganbayan judgment.

Accordingly, Duran has not provided evidence that the Sandiganbayan judgment was procured by fraud and the Government is entitled to summary judgment on Duran's Fourth Affirmative Defense.

c.    Jurisdiction

Section 2467(d)(1)(C) provides that a forfeiture judgment shall not be entered if "the foreign court lacked jurisdiction over the subject matter."  Duran's Second Affirmative Defense argues that the Sandiganbayan "lacked subject matter jurisdiction over the Arelma Assets" because "[a]t the time the Arelma forfeiture action was pending . . . the Arelma Assets were in custodia legis of the federal court in Hawaii."  Duran Ans. ¶¶ 27-28.

We begin by noting that Duran asserts without citation that "the burden of establishing that the Sandiganbayan had jurisdiction over [the Arelma Assets] is on the [Government]."  Duran Cross-Mot. Mem. at 1-2.  In fact, the mandatory language in section 2467 — that the Court "shall" enter necessary orders unless it finds a listed defense applicable, see 28 U.S.C. § 2467(d)(1) — indicates that the burden is on Duran, as the party opposing enforcement, to demonstrate the existence of the affirmative defenses listed in section 2467.

In any event, Duran seeks to establish this defense by repeatedly citing to United States law on forfeiture and subject matter jurisdiction.  See, e.g. Duran Cross-Mot. Mem. at 3-6.  In fact, unlike the references to "due process" in section 2467(d)(1)(A), the reference to jurisdiction over the "subject matter" jurisdiction defense in section 2467(d)(1)(C) necessarily refers to whether the foreign country's laws, not United States forfeiture law, permitted the foreign court to issue an order regarding the forfeited asset.  We reach this conclusion because the "subject matter" defense specifically refers to the "foreign court" having subject matter jurisdiction.  28

U.S.C. § 2467(d)(1)(C).  Whether a "foreign court" could exercise subject matter jurisdiction can only be understood by reference to the "foreign" law that the "foreign court" was applying.[12]

To meet his burden of demonstrating what Philippine law provides as to the jurisdiction of the Sandiganbayan, we would have expected Duran to supply an affidavit of an expert in Philippine law that cites to Philippine case law, rules, or statutes showing that the Sandiganbayan's exercise of subject matter jurisdiction was improper.  But no such affidavit has been supplied.[13]

In the absence of a competent affidavit of an expert, we are left only with the Sandiganbayan's own ruling asserting subject matter jurisdiction over the Arelma Account.  See Sandiganbayan Judgment at *48 ("There is no reason to doubt that this Court has jurisdiction and authority to render a judgment of forfeiture on all assets and funds of Arelma . . . including those funds . . . invested at Merrill Lynch [in] New York.").  Also in the record is the Philippine Supreme Court's statement on the issue in Marcos v. Republic of Phil., dated Mar. 12, 2014, annexed as Ex. A to Application (Docket # 1-1), at *98, which addressed the Sandiganbayan Judgement at issue here.  That ruling stated that:

> [T]he Sandiganbayan did not err in granting the Motion for Partial Summary Judgment, despite the fact that the Arelma [A]ccount and proceeds are held abroad.  To rule otherwise contravenes the intent of the forfeiture law, and indirectly privileges violators who are able to hide public assets abroad: beyond

---

[12] While the parties cite no case law that directly addresses this choice-of-law question, courts in other cases have looked to the law of the foreign country when applying this defense.  See Eclipse, 2022 WL 4119773, at *6 (Spanish law); In re $6,871,042.36, 2021 WL 1208942, at *5 (Brazilian law).

[13] Roxas, who lacks standing, cites to a declaration of an expert who conclusorily asserts that the Philippine Courts did not have subject matter jurisdiction.  See Desierto Decl. ¶ 23.  Duran, however, does not rely on this affidavit and in any event, the affidavit is not persuasive as it lacks any citation to Philippine law for the jurisdictional point.  See id.  It was also filed without notice to the Government and in violation of the expert disclosure requirements, and thus would not be considered anyway.  See Gov't SJ Reply at 31-32.

> the reach of the courts and their recovery by the State. Forfeiture proceedings . . . are actions considered to be in the nature of proceedings <u>in rem</u> or <u>quasi</u> <u>in</u> <u>rem</u>, such that [j]urisdiction over the <u>res</u> is acquired either (a) by the seizure of the property under legal process, whereby it is brought into actual custody of the law; or (b) as a result of the institution of legal proceedings, in which the power of the court is recognized and made effective. <u>In the latter condition, the property, though at all times within the potential power of the court, may not be in the actual custody of said court.</u>

<u>Id.</u> at *101 (quotation omitted) (emphasis in original).

Duran argues that the Arelma Assets were subject to the "prior exclusive jurisdiction" doctrine at the time of the Sandiganbayan's assertion of <u>in rem</u> jurisdiction because they had been deposited with the District of Hawaii. Duran Cross-Mot. Mem. at 5-6. Duran characterizes this doctrine as holding that "once one court exercising <u>in rem</u> jurisdiction has taken control over an asset, no other court may purport to adjudicate interests in that <u>res</u>." <u>Id.</u> at 5 (citing <u>Farmers Loan & Tr. Co. v. Lake St. Elevated R. Co.</u>, 177 U.S. 51, 61 (1900)). But Philippine law applies to the "subject matter" jurisdiction issue and Duran provides no evidence as to Philippine law on the matter. In any event, "prior exclusive jurisdiction" is a doctrine that stems from concerns regarding comity among state and federal courts, 13F Wright & Miller, Federal Practice & Procedure § 3631 ("[T]he prior-exclusive-jurisdiction rule is based at least in part on considerations of judicial comity."), which is not at issue here where the courts are one federal court and one foreign court. Additionally, as the Government observes, "Section 2467(d)(3)(A)(i) expressly allows a U.S. court to issue a restraining order against property to preserve the property for foreign forfeiture proceeding[,] even before a foreign court has commenced forfeiture proceedings." Gov't SJ Reply at 29; <u>see</u> <u>United States v. Federative Republic of Brazil</u>, 748 F.3d 86, 90 n.4 (2d Cir. 2014) ("Congress amended 28 U.S.C. § 2467 to permit district courts to issue restraining orders 'at any time before or after the initiation of forfeiture proceedings by a foreign nation[.]'") (quoting 28 U.S.C. § 2467(d)(3)(A)). This

demonstrates that a United States court's exercise of jurisdiction over the res — including the placement of the res under a restraining order — is not an act that deprives the foreign court of jurisdiction within the meaning of the statute.

Duran also argues that a statement in the Ninth Circuit's denial of a petition for rehearing in the Interpleader Case should control here. Duran Cross-Mot. Mem. at 2. That decision stated that "[t]he Republic has no jurisdiction over the rem, which is in the United States, and any judgment made without proper jurisdiction is unenforceable in the United States." Merrill Lynch, Pierce, Fenner and Smith, Inc. v. ENC Corp., 467 F.3d 1205, 1207 (9th Cir. 2006) (subsequent history omitted). This statement is dictum, and the Ninth Circuit's affirmance of the interpleader was of course reversed by the Supreme Court. See Pimentel, 553 U.S. at 873. In any event, this statement (1) was made without any reference to the requirements of section 2467; and (2) is inconsistent with the Supreme Court's own statement noting that the Republic "might bring an action" in the United States to enforce the forfeiture judgment, citing section 2467. See Pimentel, 553 U.S. at 868. Thus, it has no bearing on our adjudication of the instant application.

In sum, Duran has not shown that the Sandiganbayan lacked subject matter jurisdiction to render the judgment sought to be enforced here. Accordingly, the Government should be granted summary judgment as to Duran's Second Affirmative Defense.

2.      Other Defenses

Duran's answer lists additional defenses not contemplated by section 2467. Duran's Seventh Affirmative Defense argues that he and his class have priority over the Arelma Assets as first-in-time creditors. Duran Ans. ¶ 58. Duran's Eighth Affirmative Defense argues that this matter should be barred as res judicata due to previous cases filed by the Republic of the

Philippines.  Id. ¶ 64.  Finally, Duran's Ninth Affirmative Defense argues that the court should reject the Government's application on comity grounds.  Id. ¶ 65.  Each of these defenses fails.

Duran is not entitled to raise defenses of priority or comity.  Section 2467 lists five grounds upon which the court may decline to register a foreign judgment, involving due process, personal jurisdiction, subject-matter jurisdiction, notice, and fraud.  See 28 U.S.C. § 2467(d)(1).  The statute dictates that "[t]he district court shall enter such orders as may be necessary to enforce the judgment" unless one of these flaws is present in the forfeiture judgment.  Id. (emphasis added).  A court does not have discretion to consider other defenses.  See Eclipse, 2022 WL 4119773, at *5 ("Because [respondent's] claim does not fall within a statutory exception in 28 U.S.C. § 2467(d)(1), this [c]ourt will not consider it.").  Because neither the priority of creditors defense nor the comity defense are listed in the statute, we do not entertain them here.

On the other hand, we are not convinced that the statutory language prevents respondents from raising res judicata.  To do so would allow the Government to repeatedly bring the same application without regard to prior attempts, in defiance of the common law principle that a decision on the merits should "ensur[e] a definitive end to litigation."  See Bryant v. United States, 71 F. Supp. 2d 233, 236 (S.D.N.Y. 1999) (citing Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 401 (1981)).  "[W]here a common-law principle is well established, as are the rules of preclusion, the courts may take it as a given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident."  Channer v. Dep't of Homeland Sec., 527 F.3d 275, 280 (2d Cir. 2008) (quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991)).  The purpose of section

2467 — to allow the United States Government to enforce a foreign forfeiture judgment — is fully consistent with principles of res judicata.

As to the merits, the res judicata argument is rejected. Duran argues that the Government's application is barred under the "multiple dismissals" section of Rule 41 of the Federal Rules of Civil Procedure. Duran SJ Opp. at 24-26. Rule 41 provides that where a plaintiff unilaterally dismisses an action, "[u]nless the notice or stipulation states otherwise, the dismissal is without prejudice." Fed. R. Civ. P. 41(a)(1)(B). However, "if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits." Id. Duran points to three previous cases brought by the Republic of the Philippines against Marcos. See Duran SJ Opp. at 24; see Republic of Phil. v. Marcos, 806 F.2d 344 (2d Cir. 1986); Republic of Phil. v. Marcos, 862 F.2d 1355 (9th Cir. 1988); Republic of Phil. v. Marcos, No. 86-cv-1184 (S.D. Tex. 1986). He argues that these suits each, "in stunningly broad language, alleged the misappropriation of hundreds of millions or billions of the Republic's property" by Ferdinand Marcos, Duran SJ Opp. at 24, and that each suit was dismissed by the Republic, id. at 26. Duran argues that under Rule 41, these dismissals operate as an adjudication on the merits which should preclude any future suits relating to the same claim. Id. He asserts that the Sandiganbayan proceeding concerned the same allegations and argues that the instant application "is 'based on' the claim in the [Sandiganbayan] proceeding," and thus barred under Rule 41 as an attempt to relitigate the claims in the previously dismissed cases. Id. at 29.

Setting aside the question of whether these previous dismissals qualify as an adjudication on the merits, Rule 41 does not preclude the Government's application. The application before the court is not a civil suit against Marcos and does not seek a judgment against Marcos

predicated on the misappropriation of funds, as was true of the three civil actions Duran relies on. Instead, this action is a suit brought by the United States to register and enforce a judgment already rendered by the Sandiganbayan. Duran argues that the bar applies because the three dismissed actions involved pleading that Marcos "loot[ed] billions of dollars" and the instant action is based on the same claim. Id. at 28. But this argument fails to recognize the different character of the three cases and the application here. Here, the application makes no claim against Marcos but claims only that a foreign judgment exists and must be enforced. See 28 U.S.C. § 2467. Indeed, the court here is bound not to re-adjudicate the underlying facts of the Sandiganbayan judgment. Id. § 2467(e). This accords with our previous holding that "[t]he section 2467 claim is a separate action to enforce an existing foreign forfeiture judgment" which "does not revisit the merits of the foreign judgment" and thus "is not the same 'claim' that was pursued by the foreign government in its courts." In re Enf't of Phil. Forfeiture Judgment, 442 F. Supp. 3d 756, 762 (S.D.N.Y. 2020). Because this application is "a new claim for relief," see id., it cannot be precluded by the previous dismissals.

Because the comity and priority defenses are outside the scope of defenses allowed by the statute and the res judicata defense is unavailing, the Government should be granted summary judgment on Duran's Seventh, Eighth, and Ninth Affirmative Defenses.

### 3. Limitation of Enforcement Amount

The Government seeks summary judgment on Duran's Sixth Affirmative Defense. Gov't SJ Mem. at 27-28. This defense alleges that, even if the Government is allowed to register the Philippine judgment, the amount of the judgment should be capped at $3,369,975.00. Duran Ans. ¶ 52. We view this issue not as a "defense" but rather as an effort to define the scope of the

"orders" a court is required to issue "as may be necessary to enforce the judgment" under section 2467(d)(1). We thus address it on the merits.

Duran argues that the judgment should be limited to this amount because "[b]oth Section 2467 and New York law only permit recognition and enforcement of foreign monetary judgments for sums certain," and "[t]he only sum certain in the 2009 Sandiganbayan judgment is $3,369,975.00." Duran SJ Opp. at 44. We reject this argument. There is nothing in section 2467 that refers to the necessity of a foreign forfeiture judgment being in the form of a "sum certain." Duran's support for this argument is to point to the portion of section 2467 that provides that the "[p]rocess to enforce a judgment shall be in accordance with Rule 69(a) of the Federal Rules of Civil Procedure." 28 U.S.C. § 2467(d)(2). Duran then notes that Rule 69(a) refers to the procedure for the enforcement of money judgments and that another portion of section 2467 addresses the rate of exchange to be used where there is judgment "requiring the payment of a sum of money submitted for registration." See Duran SJ Opp. at 45 (citing 28 U.S.C. § 2467(f)). Duran goes on to argue that New York law permits registration only of a foreign judgment for a sum certain. Id. at 45-46.

None of these arguments prevents the forfeiture of the entire Arelma Assets as stated in the Sandiganbayan judgment. Section 2467 itself recognizes that a foreign forfeiture may either involve a "sum of money" or specific "property." See 28 U.S.C. § 2467(a)(2)(A), (B). Certainly, to effectuate the forfeiture of a bank account may require a court order directing the payment of money in the form of a money judgment.[14] But section 2467 does not require that

---

[14]   Thus, Duran is incorrect that the term "property" cannot involve a bank account lest section 2467(a)(2)(A), referring to an order of a foreign court to "pay a sum of money," be rendered "superfluous." Duran SJ Opp. at 48. The statute plainly seeks to cover foreign forfeiture judgments that involve either the payment of a specific sum or of the forfeiture of specific property. See 28 U.S.C. §§ 2467(A), (B).

the initial foreign forfeiture judgment be in the form of a money judgment.  Under the Supremacy Clause, nothing in New York law can alter the effect of section 2467.

The Sandiganbayan judgment forfeits "all" of the Arelma Assets held at Merrill Lynch. Sandiganbayan Judgment at *57.  While the judgment gives an "estimated" aggregate amount of the assets at the time of the judgment, the judgment is clear that the Arelma Assets from the Merrill Lynch account are forfeited in their entirety.  Id.

Duran argues that "the investment account at Merrill Lynch ceased to exist after Merrill Lynch deposited the money into the Hawaii Federal Court in 2000" and that the 2009 transfer of the money to Merrill Lynch was not put into "an investment account."  Duran SJ Opp. at 47-48. But the multiple court decisions and orders that governed the movement of this money from Merrill Lynch to the Hawaii Court and back to Merrill Lynch repeatedly refer to the money as being the Arelma Assets.  See, e.g., Order for Return of Interpleaded Assets (referring to the "interpleaded assets"); Swezey Order (referring to the "Arelma Assets").  Thus, there is no ambiguity as to the intention and effect of the Sandiganbayan judgment.

In sum, the Government should be granted summary judgment as to Duran's Sixth Affirmative Defense.

### C.    Duran Cross-Motion

Duran's cross-motion seeks the dismissal of the Government's application.  See Cross-Mot.  Because Duran's cross-motion mirrors various aspects of the Government's motion, and the Government has prevailed on its motion, Duran's cross-motion must be denied.

## IV.    CONCLUSION

For the foregoing reasons, (1) the Government's motion for summary judgment as to Roxas's standing (Docket # 188) should be granted and Roxas should be dismissed as a

respondent; (2) the Government's motion for summary judgment (Docket # 193) should be

granted; and (3) Duran's cross-motion for summary judgment (Docket # 222) should be denied.

The district court should issue the Order proposed by the Government registering and enforcing

the foreign forfeiture judgment (Docket # 207).

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of

this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d).

A party may respond to any objections within 14 days after being served. Any objections and

responses shall be filed with the Clerk of the Court. Any request for an extension of time to file

objections or responses must be directed to Judge Kaplan. If a party fails to file timely

objections, that party will not be permitted to raise any objections to this Report and

Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a),

6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins,

Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: October 3, 2023
      New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge